391 So.2d 466 (1980)
James F. GASQUET, Jr.
v.
COMMERCIAL UNION INSURANCE COMPANY, Stonewall Insurance Company, and H & B Construction Company of Louisiana, Inc.
No. 11140.
Court of Appeal of Louisiana, Fourth Circuit.
October 9, 1980.
Rehearings Denied December 19, 1980.
*468 Carl W. Cleveland, Dawn M. Barrios, New Orleans, for plaintiff-appellant.
Liskow & Lewis, Frederick W. Bradley, Donald R. Abaunza, New Orleans, for Stonewall Insurance Company, defendants-appellees.
Before SAMUEL, GULOTTA, GARRISON, CHEHARDY and SARTAIN, JJ.
CHEHARDY, Judge.
Plaintiff, James F. Gasquet, Jr., appeals from a trial court decision dismissing his suit for personal injury damages against Stonewall Insurance Company (Stonewall) and H & B Construction Company of Louisiana, Inc. (H & B). The judgment, which also ordered plaintiff to pay all costs of the proceedings, was in accord with a jury verdict which found the defendants were guilty of negligence and that such negligence was a proximate cause of the injuries suffered by the plaintiff. The jury further found, however, the plaintiff's failure to use ordinary care, under the circumstances, for his own safety, contributed to the injury he may have suffered.
Prior to the trial the plaintiff settled all claims against Commercial Union Insurance Company (Commercial Union), which was the primary insurer of H & B, in consideration of the payment of $200,000; and pursuant to that settlement agreement the plaintiff granted the excess carrier, Stonewall, a credit of $300,000 against any judgment that might be rendered against it by the trial court.
The facts of this case surround an accident which occurred when an airboat in which the plaintiff was a passenger came to a sudden stop as it hit a sandbar, resulting in severe skull, facial, eye, dental, and other injuries to Gasquet.
On November 28, 1976, the plaintiff, a supermarket owner, went on a duck hunting trip in Plaquemines Parish with several friends. The duck hunting camp, a houseboat, located in a canal near the Mississippi River, and the lease on which they hunted belonged to H & B. Access to the hunting lease from the hunting camp was provided by airboats owned by H & B. The particular airboat used to transport Gasquet to and around the hunting lease was a large, flat-bottomed, heavy-duty aluminum boat with *469 high sides and a huge aircraft engine mounted at the rear. Film which was part of the trial court record shows the airboat can travel over water, mud and even wet grass and that it has a large, powerful and very noisy engine with no mufflers. The operator of the airboat, Lloyd Boudreaux, an employee of H & B, sat on a raised platform toward the middle rear of the airboat, which he drove by means of a rudder lever on his left and an accelerator pedal in front of him.
The record establishes that on the morning of the accident the weather was very cold, the temperature near freezing, with strong winds blowing. Gasquet and several other hunters were taken to their duck blinds by Boudreaux in the airboat; however, the airboat passengers were not given any instructions or warnings by Boudreaux concerning their conduct in the moving airboat. The fact that oral communication was impossible because of noise from the airboat engine was demonstrated at trial by George Pappas, a sound expert who also testified that at all speeds, other than idling and cold, any spoken communication would be impossible on the airboat.
About 9:30 a. m., Boudreaux returned for the duck hunters. He first picked up Walnut Latham, who testified that since he was wrapping the weights on strings around the decoys to keep them from becoming entangled, his hands had gotten wet and he was almost freezing as he rode the airboat. The airboat operator then picked up Gasquet and proceeded to pick up another duck hunter, Floyd Barrios. (However, because of the accident, Barrios was not picked up until later.) After the airboat left plaintiff's duck blind, Boudreaux tapped Gasquet on the shoulder and motioned at Latham, who was standing. Gasquet then grabbed Latham by the leg and pulled him back. This occurred about a mile before they reached the sandbar.
The airboat then proceeded down a long straight pipeline canal and through a shallow, skinny, snake-like cut that emptied into the bay which was the accident site.
Earlier on the same day, when his only passenger was Floyd Barrios, Boudreaux had hit the sandbar that he was now approaching. Despite this, instead of selecting the alternative of going around the sandbar, he decided to jump the airboat over it. Furthermore, expert testimony indicated any oral warning would have been impossible to hear.
However, instead of going over it, as it did earlier in the day, the airboat stopped like "it hit a brick wall."
Gasquet testified that at the time the airboat struck the sandbar he was "holding on with one hand at least." Although in an earlier deposition Gasquet had indicated he had mixed feelings as to whether or not he was holding on, he stated on cross-examination, "At this time, I feel certain that I was holding on."
Nonetheless, Gasquet was thrown out of his seat and crashed face first into a large tool box in the bulkhead across the front of the airboat.
Barrios said that on his earlier trip in the boat Boudreaux operated it at 25 to 30 miles per hour in the canal and the cut, but slowed down to 15 to 20 miles per hour at the end of the cut. Boudreaux admitted he knew of the presence of the sandbar because he had proceeded over it earlier in the morning with Barrios. He also said he knew it was sand and not mud, because it nudged the bottom of the boat on the earlier trip. He added if it had been mud the airboat would have slid through it because "sand is the only thing that will stop it."
Boudreaux described the sandbar as approximately 20 feet wide and said it was about ½ inch out of the water. He also said, contrary to the plaintiff's testimony, that prior to the accident he told Gasquet, "We're going to go over a sand bar. Get Walnut, tell him to come sit down and hold on. We're going to jump that sand bar." Neither Gasquet not Latham, however, testified that there was a specific warning issued from Boudreaux regarding the sandbar they were approaching.
*470 Boudreaux also testified there was some bracing over the passenger seats in the airboat for the riders to hold to; however, Gasquet described it as merely a "lip" which extended from the side of the boat.
Boudreaux claimed that at the time of the crash Gasquet must have had his hands in his pockets, because he remembered the first thing he did, after the injury, was to remove Gasquet's hands from his pockets. The plaintiff's impression, however, was that he had been holding on with at least one hand. The other passenger (Latham) admitted he had not been holding on but that he had both hands in his own pockets due to the extremely cold and windy weather.
Boudreaux stated the sudden impact of the boat being stopped by the sandbar was like "hitting a brick wall." He said Latham "rode the pirogue" positioned in front of him as he was thrown forward and out of the boat, and Latham himself said he landed in the water some 15 to 20 feet in front of the airboat. According to Boudreaux, Gasquet was thrown forward into the bow of the boat where his face hit a tool box, resulting in his injuries.
Boudreaux's only explanation for why the boat on this trip stopped so suddenly on the sandbar, which it had successfully crossed earlier that morning, was that the cold air and the sun must have dried and hardened the sand, during the hours intervening the two trips, to such an extent as to render it impassable.
Following the accident the plaintiff was transported by helicopter to a hospital in Port Sulphur; however, due to the seriousness of his injuries, he was immediately transferred to West Jefferson General Hospital in Marrero, Louisiana.
In answering the plaintiff's appeal, the defendant Stonewall argues the trial court erred in refusing to grant its motion for summary judgment based on its claim that, as a result of the plaintiff's settlement with Commercial Union for a sum below that company's primary policy limits, there is no coverage by Stonewall in the present case.
In addressing ourselves to Stonewall's denial of coverage in the instant case, we note the language provided in paragraph 11 under the heading "Conditions" in Stonewall's policy of excess indemnity insurance, number 3200081, which provided umbrella or excess coverage to H & B in the amount of one million dollars:
"Loss Payable. Liability under this policy with respect to any occurrence shall not attach unless and until the insured, or the insured's underlying insurer, shall have paid the amount of the underlying limits on account of such occurrence. * * *"
Stonewall argues that since the underlying limit of $300,000 was not "paid" by either H & B or Commercial Union, and cannot be in light of the settlement agreement between Gasquet, H & B and Commercial Union, Stonewall can have no liability under its excess indemnity policy.
In the partial receipt and release issued by Gasquet in favor of the defendants Commercial Union and H & B, it was stipulated:
"WHEREAS, Gasquet, recognizing the uncertainties of litigation, is willing to accept $200,000 in cash for a complete release to Commercial Union for all claims arising under the primary insurance policy providing $300,000 in coverage; and
"WHEREAS, Gasquet is willing to allow a credit to Stonewall for the full $300,000 amount of the primary insurance policy issued by Commercial Union in consideration for the aforesaid payment by Commercial Union; and
"WHEREAS, Gasquet specifically desires to reserve to himself and to specifically exclude from this partial receipt and release all claims against Stonewall (in excess of the $300,000 primary insurance coverage) and to continue to prosecute the said claims against Stonewall pursuant to the Louisiana Direct Action Statute, LA.R.S. 22:655; and
"WHEREAS, Gasquet is willing to release H & B, B & S, and Louisiana Dredging from all claims which might be recovered from H & B, B & S and Louisiana *471 Dredging directly, but specifically reserving his claims only to the extent that collectible coverage is afforded to H & B, B & S, and Louisiana Dredging by the said policy of excess insurance issued by Stonewall * * *."
Louisiana jurisprudence supports the settlement made by plaintiff with his primary insurer and the trial court properly denied Stonewall's motion for summary judgment.
Two most important Louisiana cases on point are Futch v. Fidelity & Casualty Company, 246 La. 688, 166 So.2d 274 (1964), and Benroth v. Continental Casualty Company, 132 F.Supp. 270 (W.D.La.1955).
In Futch, supra, the policy was not a true excess policy because the primary insurance policy and the excess insurance policy were held by two different people. The court, however, treated it as a true excess insurer situation, and, citing LSA-C.C. art. 3073, said that the court must look to the intent of the parties in a settlement agreement. Since the court found their intent was to reserve rights against the excess insurer, it concluded that the fact there was a settlement with the primary insurer was of no consequence to the excess insurer, whose liability was fixed as of the time of the accident due to Louisiana's direct action statute.
In Benroth, supra, once again the policies were held by two different individuals, so there was not a true "excess" situation. Also, that excess policy said that the primary insurance must be "exhausted" rather than "paid" as the policy in our present case states. The court in Benroth, however, treated the policies as a true "excess" situation and found that since it is the policy of the law to favor settlements, there was no prohibition against proceeding against the excess insurer, giving him a "credit" for the policy limits of the primary insurer. Once again, because of our direct action statute the court said that the insured is not even a necessary party to the action.
In Zeig v. Massachusetts Bonding & Ins. Co., 23 F.2d 665 (2d Cir. 1928), the court held an excess insurer could specifically forbid settlement with a primary insurer (as a condition precedent to liability) in the excess policy if they so chose; however, the court felt this would be a bad policy, promoting litigation. That court also concluded the word "payment" in an insurance policy does not have to mean only payment in cash and examination of LSA-C.C. art. 2131 reinforces the court's holding on that point.
Stargatt v. Fidelity and Casualty Co. of New York, 67 F.R.D. 689 (D.Del.1975), also followed Zeig, supra, and allowed the primary insurer to settle below policy limits while holding the "excess" coverage as still collectible, maintaining that to do otherwise would be unnecessarily "stringent."
Furthermore, the reasoning in Futch, supra, was also followed in the recent case of American Home, Etc. v. Commercial Union, Etc., 379 So.2d 757 (La.App. 4th Cir. 1980), where this court rejected a suit by an excess insurer against a primary insurer, holding the excess insurer was not entitled to recover from the primary insurer on theories of either subrogation or unjust enrichment.
In support of its position on this point, defendant Stonewall has cited the case of United States Fire Ins. Co. v. Lay, 577 F.2d 421 (7th Cir. 1978), which declared in considering a release in settlement and an umbrella policy similar to those in the present case, that the settlement agreement extinguished liability of the excess insurer, holding that otherwise the primary insurer would have no incentive to defend in good faith or discharge its duty to the excess insurer. However, the court specifically said in that case at page 423:
"It is argued on behalf of the administratrix that the excess policy is not a true indemnity policy because it does not require that the insured actually pay the judgment before liability attaches. See 7 J. Appleman, Insurance Law and Practice, § 4261 (1962). Whether or not the policy is one of indemnity in the technical sense, it is in substance a contract for indemnity against liability. The obligation to pay does not arise until the insured *472 becomes liable. The excess carrier has no obligation whatsoever unless and until the insured becomes liable."
In view of Louisiana's Direct Action Statute, R.S. 22:655, and the jurisprudence of our state, we do not find the Lay case applicable to the situation in the matter before us.
Plaintiff's release of the primary insurer, Commercial Union, and partial release of H & B for less than the full primary limits, but granting a credit for the full primary limits and reserving the right to proceed against the excess carrier, did not release Stonewall from its liability as the excess insurer. The trial court properly overruled Stonewall's motion for summary judgment.
In continuing our consideration of the issues raised by Gasquet and Stonewall on appeal, we note that plaintiff submitted 81 jury charges in the trial court, all of which were denied.
On appeal, plaintiff has specified the following assignments of error:
1. The trial court erred in refusing to charge the jury on the doctrine of strict liability pursuant to Civil Code Article 2317.
2. The trial court erred in charging the jury on contributory negligence in the absence of allegation or proof that the conduct of the guest passenger-plaintiff in failing to hold on to his seat was a proximate cause of the airboat crash.
3. The trial court erred in charging the jury on contributory negligence in the absence of evidence proving that the actions of the guest passenger-plaintiff either caused or aggravated his injuries.
4. The trial court erred in failing to charge the jury on the legal standard by which the conduct of a boat guest passenger is measured.
5. The trial court erred in failing to charge the jury on the doctrine of "duty-risk" with respect to the conduct of the parties.
6. The trial court erred in failing to charge the jury on the doctrine of last clear chance.
7. The trial court erred in excluding the testimony of an expert airboat operator called as a witness by the plaintiff.
8. The trial court erred in excluding the testimony of the plaintiff's expert actuary concerning the computation of the plaintiff's loss of earning capacity.
9. The trial court erred in refusing to permit the plaintiff's attorney rebuttal in the closing argument.
10. The trial court erred in taxing all costs against the plaintiff after a finding of negligence by the defendant.
We do not find merit in appellant's contention that the trial court erred in refusing to charge the jury on the doctrine of strict liability pursuant to LSA-C.C. art. 2317, which provides:
"We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications." (See LSA-C.C. arts. 2318-2324)
The facts in the instant case do not satisfy the requirements of LSA-C.C. art. 2317 or jurisprudential rulings on strict liability.
The Supreme Court decisions of Loescher v. Parr, 324 So.2d 441 (La.1975), and Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), dealt with factual situations wherein an injured person sought to prove damages from an unreasonable risk of harm to others by an offending instrumentality and declared that once such damages are proven "the owner or guardian responsible for the person or thing can escape liability only if he shows the harm was caused by the fault of the victim, by the fault of a third person, or by an irresistible force." Arceneaux, supra, at page 1335.
In refusing to grant the plaintiff recovery on the principles of strict liability, the court in Arceneaux, supra, explained it had concluded the harm or accident was not caused by a mechanical brake failure but by the negligence of the driver, or third person, *473 thereby exculpating the defendant-owner from responsibility.
Similarly, in the case of Marquez v. City Stores Co., 371 So.2d 810 (La.1979), the court dealt with an instrumentality (an escalator) which was the cause of the plaintiff's injury and held that it would not have created such an "unreasonable risk of harm" had it not been defective. The court, therefore, held City Stores liable under LSA-C.C. art. 2317 even though no defect could be proven.
All of the above cases are clearly distinguishable from the present one, where it cannot be concluded from a review of the facts that the plaintiff's injury was caused from the instrumentality (airboat) itself. We do not dispute that an airboat is a potentially dangerous instrumentality; however, in the instant case the instrument was at all times in control of the operator, Boudreaux, whose negligent handling of the airboat caused the accident.
It is our opinion that the trial judge properly refused to give plaintiff's requested charge of strict liability to the jury.
This court holds that the evidence in the record supports the trier of fact's conclusion that Boudreaux, the driver of the boat, was negligent and that this negligence was a proximate cause of the accident, i. e., the boat coming to a sudden and unexpected stop, as well as the proximate cause of the plaintiff's injuries. Boudreaux testified he learned of the presence of the sandbar earlier on the day of the accident because the sandbar had nudged the bottom of the boat as he crossed it. Since Boudreaux was familiar with the area and had operated the airboat in this location for a number of years, he should have known of the possibility that the sand or mud would become drier and more hard packed by the strong winds and changing tide, and he was, therefore, not exercising reasonable care when he once again attempted to jump the sandbar several hours later (while transporting Gasquet and Latham) without first ascertaining that he could safely perform such a patently dangerous maneuver.
The record, evidence, testimony and exhibits support the conclusions that:
1. The sandbar, which Boudreaux attempted to jump the airboat over was some 20 feet wide.
2. Boudreaux was aware of its presence, having "nudged" it earlier in the day of the accident.
3. Immediately prior to attempting the jump of the sandbar, Boudreaux did not warn plaintiff or the other passenger, in any manner, that he was going to jump a sandbar.
4. The only warning ever given plaintiff was a tap on his shoulder and a motion to have Latham sit down, immediately after retrieving plaintiff from his duck blind. This took place some time and some distance before the attempted jump.
5. If credence is given to Boudreaux's testimony that he told plaintiff "We're going to go over a sand bar. Get Walnut, tell him to come sit down and hold on. We're going to jump that sand bar" this warning would have been given immediately after picking up plaintiff and while Walnut was still standing and handling the decoys.
6. In view of expert testimony and that of the witnesses, we can only conclude from the record that oral communication was impossible.
7. There was evidence refuting the contentions that the airboat was only traveling 10 miles per hour when it hit the sandbar.
8. The record does not disclose any testimony whatsoever to show that had Gasquet held on the accident and/or his resultant injuries would not have happened nor the injuries lessened.
9. The testimony of plaintiff was that he was holding on with one hand-he persisted in this despite cross-examination reference to his earlier deposition wherein he expressed inability to recall whether he was holding on or not.
10. The record does not show a provision for any type of safety devices either for holding on in a secure fashion (such as *474 perhaps a bar, similar to that employed on roller coasters at amusement parks) or any type of hand grip for a guest to hold securely. Certainly, after carefully reading this record and its detailed information, through movies put in evidence on just what an airboat is and how and where it operates, common sense would dictate that in late November, in the Louisiana marshes, with north winds blowing, shallow lakes, canals, etc., would subject an airboat to exposed sandbars, whether of sludge, mud or sand, but dried or crusted over sufficiently to cause exactly what happened in the instant case.
With these facts and all of the record and evidence in mind we will next consider plaintiff's assignment of errors Nos. 2, 3, 4 and 5.
To properly consider these assignments of error, we should note the trial judge's charge on contributory negligence and assumptions of risk, which was as follows:
"Contributory negligence is fault on the part of a party injured, which cooperates in some degree with the negligence of another and so helped to bring about the injury.
"By the defense of contributory negligence, the defendant alleges that even though he may have been guilty of some negligent act or omission which was approximate cause, the plaintiff, by his own failure to use ordinary care under the circumstances for his own safety also contributed to any injuries and damages plaintiff may have suffered.
"Now, the burden is on the defendant alleging the defense of contributory negligence to establish by a preponderance of the evidence in the case, the claim that the plaintiff, himself, was at fault and that such fault contributed to any injury and consequent damages plaintiff may have sustained.
"Any negligence on the part of the one claiming damages, if that negligence contributed as approximate cause to the injury complained of, bars his recovery of any damages whatsoever.
"If you conclude that the plaintiff did contribute to his own injury and accident through his own negligence, you must render a verdict for the defendant.
"If you find from the evidence that the plaintiff did not contribute to his own injury, and that the injury, or damage, was caused by the negligence of the defendant, and this negligence was approximate cause of the injury or damage, you must then render a verdict for the plaintiff unless the defendant can carry the burden of proving by a preponderance of the evidence that the plaintiff assumed the risk.
"The defendant also alleges the defense of assumption of risk. If you conclude that the plaintiff has established the first two elements of his case, namely negligence and causation, then you must determine whether the defendant has proved that the plaintiff has nonetheless relieved the defendant of responsibility for the harm caused to the plaintiff by assuming the risk of that harm. If you find that plaintiff assumed the risk of the harm that happened to him, then you must render a verdict for the defendant. On this issue, the defendant has the burden of proof.
"To conclude that plaintiff assumed the risk, you must find the defendant has proved two things by preponderance of the evidence: That plaintiff fully understand [sic] the danger which was involved and that plaintiff then voluntarily exposed himself to the danger, or risk of harm. In this connection, you must answer the question on the basis of what this plaintiff in this lawsuit understood and what he encountered voluntarily."
In Jackson v. West Jefferson General Hospital, 245 So.2d 724, 727 (La.App. 4th Cir. 1971), the court held:
"A charge, even if it is a correct statement of law, must be based on evidence adduced in the case in order for the jury to make the conclusion permitted in the charge. Guerra v. W. J. Young Construction Co., Inc., 165 So.2d 882 (La.App. 4th Cir. 1964)."
*475 And in Fontenot v. Fidelity & Casualty Co. of New York, 217 So.2d 702, 704 (La. App.3d Cir. 1969), the court held:
"A plea of contributory negligence is an affirmative defense, and the party pleading it bears the burden for establishing facts which will support such a plea. LSA-C.C.P. art. 1005; McDaniel v. Louisiana & Arkansas Railway Company, 194 So.2d 119 (La.App.2d Cir. 1967)."
This court agrees with plaintiff that the trial court's charge of contributory negligence constitutes clear legal error. The record just does not show evidence sufficient to support the court's charge on this point. There is not one iota of evidence to establish that had plaintiff held on the accident would not have happened or that had he held on he would have suffered no injury or even would have lessened his injury.
In Theunissen v. Guidry, 153 So.2d 869 (La.1963), the court held that contributory negligence is simply negligence and is measured by the same test, whether statutory or otherwise, as primary negligence; moreover, contributory negligence, being relative, is necessarily dependent upon the facts in each case.
The court in Theunissen, supra, also noted at page 874:
"`However, it is the general rule that contributory negligence is a part of the doctrine of proximate cause, that is, to bar a recovery for an injury it must be the proximate cause thereof, and, before an illegal act or omission can be held to be contributory negligence, it must appear that there was a causal connection between such act or omission and the injury complained of. The mere collateral wrongdoing of the injured person cannot of itself defeat a right of recovery for the injury if it did not proximately contribute thereto, and, although one injured in an automobile accident may have been guilty of negligence, yet, if his negligence did not so contribute to his injury as that, but for such negligence on his part, he would not have received the injury, it will not bar a recovery. * * * ` Cyclopedia of Automobile Law and Practice, Blashfield, Volume 4, Part 2, Section 2553."
We necessarily must conclude that the trial judge was in error in giving the charge on contributory negligence since evidence was not adduced at the trial of the matter which could provide a basis for the jury making the conclusion permitted in the charge. There was no evidence proving that the conduct of a the guest passenger Gasquet in failing to hold on to his seat was the proximate cause of the airboat crashing the sandbar or that the action of plaintiff either caused or aggravated his injuries. The record is absent of any evidence that plaintiff actually had some device that would have assured his safety had he held on to it, or any evidence that he would have been able in that freezing cold, late November weather to hold on to the "lip" of the boat's side with sufficient strength not to be thrown forward at the moment of this unexpected sudden stop by this moving airboat.
According to plaintiff's testimony he was holding on with one hand and yet the accident happened. Even if we were to accept the charge on contributory negligence as proper, we would then, on the record presented, find the trier of fact was clearly wrong in finding the plaintiff guilty of contributory negligence.
We further find that the jury could not properly measure the reasonableness of the plaintiff's conduct in the absence of instructions concerning the legal standard for evaluating a boat passenger's conduct. The trial court, accordingly, was in error in not giving a charge to the jury on this issue and in failing to charge the jury on the doctrine of "duty-risk" with respect to the conduct of the parties.
In the case of Beavers v. Butler, 188 So.2d 725 (La.App.2d Cir. 1966), the court held that in determining whether the asserted fault of a guest has been a contributing factor in bringing about the injuries, it is necessary to ascertain what duties were imposed upon him. The court further said that a guest in a boat is not obliged to supervise the driving of the vehicle or look *476 out for sudden or unexpected dangers but has the right to rely on the driver to discharge that obligation in the absence of a showing that he had actual or constructive knowledge that the driver was incompetent or unfit to operate the vehicle. Furthermore, if the passenger does become aware of such a danger not observed by the driver, it is incumbent upon the guest only to warn him.
In Beavers, supra, the court said[1] at page 729:
"`* * * But in determining whether the asserted fault of a guest has been a contributing factor in bringing about his injuries, it is first necessary to ascertain what duties are imposed upon him as pertain to the operation of the vehicle and the safety of the journey. It is firmly established by the above cited authorities of this Court and others of the Courts of Appeal of this State, too numerous to mention, that a guest is under no duty to supervise the driving of the vehicle and he is not obliged to look out for sudden or unexpected dangers that may arise. Albeit, he has the right to place reliance upon the driver to discharge that obligation, and, as aptly expressed by the Court of Appeal, Second Circuit, in Singley v. Thomas, 49 So.2d 465, 469, "* * * is not required to monitor the operation or to pay attention to the road and other traffic conditions" in the absence of a showing that he has actual or constructive knowledge that the driver is incompetent or unfit to operate the vehicle.
"`On the other hand, the jurisprudence has imposed upon the guest an obligation to avoid an accident or injury to himself under certain conditions. That duty has been tersely said by this Court, in Delaune v. Breaux, supra, to exist in cases where the guest "* * * is aware of the fact that there is danger ahead, which apparently is unknown to the driver or may be unknown to him, or where a sudden or unexpected danger arises to the knowledge of the guest, apparently not observed by the driver * * *." 174 La. [43] at page 47, 139 So. [753] at page 755. In such situations, it is incumbent on the guest to warn the driver of the danger and, if he fails to do so at a time when the driver is able to avert it, his dereliction may be said to be a contributing cause of an injury he may sustain.' (Emphasis supplied.)"
Similarly, in the case of Carroll v. Aetna Casualty & Surety Company, 301 So.2d 406 (La.App. 2d Cir. 1974), the court held that a guest in a boat is not required to monitor the operation of the vehicle or pay attention to the path ahead or the presence of obstructions or other boats. The court said at pages 408-409:
"The contention that Carroll assumed the risk of injury by riding with Brown on the lake on a dark night without headlights at high speed is likewise not well-founded. A participant in a fishing trip or other sporting activity assumes the ordinary and normal hazards incidental to the sport, but does not assume the risk of negligence on the part of a fellow participant.
"In Hawayek v. Simmons, 91 So.2d 49 (La.App.Orl.1956), where recovery was granted to a fisherman hooked in the cheek by his fishing partner while casting, the court held:
* * * * * *
"`... While one who becomes part of a fishing venture might be said to assume all ordinary and normal hazards incident to the sport, the law does not require him to assume all risks of negligence of those other persons in the fishing party.'
* * * * * *
"A guest in a boat, like a guest passenger in an automobile, is not obliged to look out for sudden or unexpected dangers. He has a right to place reliance upon the operator to discharge that obligation and is not required to monitor the operation or pay attention to the path ahead or the presence of obstructions or other boats. See Beavers v. Butler, 188 So.2d 725 (La.App. 2d Cir. 1966) writ refused 249 La. 739, 190 So.2d 242."
*477 The jury in the case before us found that Gasquet did not fully understand nor assume the risk of the driver's negligent operation of the airboat, nor did he voluntarily expose himself to this danger or risk of harm.
The case of Ratcliff v. United Services Automobile Association, 180 So.2d 58 (La. App. 2d Cir. 1965), writ refused, 180 So.2d 541 (La.1965), even standing alone would be authority for our holding that Gasquet was not guilty of contributory negligence or assumption of risk. The facts of Ratcliff, supra, are comparable in all essential elements to the instant case.
In Ratcliff, supra, the plaintiff was a guest passenger in a motorboat owned by defendant's insured and operated by Robert Gore, the insured's son. In the 15-foot boat, two back-to-back seats were behind the dashboard in front of the motor. The day before the accident the rear seat was removed for reupholstering, leaving exposed two metal studs or angle irons just behind the front seat. Just prior to the accident, the driver and passenger were sitting atop the backrest of the front seat with their feet on the seat in order to see over the bow of the boat. The cruiser left the lake bank and after traveling a short distance crossed the wake of another motorboat which had passed approximately 100 feet in front of it. As the cruiser struck the wake, it lurched violently, throwing the guest passenger (Ratcliff) backward with such force that he was impaled on the left stud or angle iron of the rear seat. The plaintiff sustained severe and exceedingly painful injuries to the rectal area of his body.
Several times on the afternoon of the accident they had crossed the wake of other boats without incident. The driver admitted that as the boat hit the wake it gave an unusual lurch which he could not explain. The basis of the guest passenger's suit was negligence on the part of the driver. Although the defendant asserted the guest passenger's negligence and assumption of risk in riding on the backrest of the front seat without proper support and in failing to take proper precautions to protect his person and guard himself against the obvious physical set-up in the boat, the court held that the defendant did not discharge his burden of establishing by a preponderance of the evidence that the actions of the plaintiff fell into either of these categories of special defenses.
Regarding the alleged contributory negligence of young Ratcliff, the court said:
"Turning to the special defenses of assumption of risk and contributory negligence, we find that the former is covered by an observation of the court in the opinion of the Percle [v. Ordoyne, 150 So.2d 902 (La.App.)] case, supra:
`There is nothing dangerous per se in riding in a boat. * * * Plaintiffs had no knowledge or warning of the manner in which the motor was fastened to the boat. Nor was it apparent to them that the motor was not securely fastened.'
"While the exposed condition of the metal studs was apparent, this did not constitute an obvious danger to a teen-age guest who was permitted to ride in the boat without any warning or caution on the part of the owner.
"The plea of contributory negligence is largely based upon the argument that Gary Ratcliff was seated on top of the backrest of the front seat and was not properly supporting himself against the danger of being thrown from this position. The proof on this point is not sufficient to support the conclusion of contributory negligence, although young Ratcliff, subjected to a searching cross-examination, testified that he was not holding on. The correctness of this testimony is doubtful in view of his testimony under repeated cross-examination that he did not remember what he was doing with his hands. It is further to be noted in this connection that young Gore testified that Ratcliff was holding onto the seat with his left hand. In any event, Ratcliff was unaware of any danger which required him to support himself, since the uncontroverted testimony of both boys was to the effect that they had crossed *478 the wakes of other boats without incident numerous times. It was the force of the impact with the wake and not the failure to support himself which caused the fall." (Emphasis ours.) 180 So.2d at 61.
Ratcliff, supra, supports our finding that Gasquet was not contributorily negligent even if it be conceded he was not holding on, absent proof that such "holding on" would have prevented the accident and/or the injuries suffered or would have lessened the injuries. The similarities between Ratcliff, supra, and the instant case in essential areas would, standing alone, dictate that we find plaintiff free of contributory negligence.
Ratcliff, supra, found the resolution of whether the passenger Gore held on to be immaterial to the contributory negligence issue. It is as obvious to us as it was to the court in Ratcliff, supra, that the nature of the accident and the injuries received in the matter before us would have occurred even if plaintiff on that freezing cold and windy late-November morning had attempted to hold on to the "lip" of the boat's side. Absent evidence to the contrary and considering the record in its entirety, we find it impossible to believe that "holding on" by plaintiff could be the determinative issue.
Furthermore, Ratcliff, supra, recognized that a guest passenger cannot be guilty of contributory negligence by failing to properly support himself in a boat when the guest passenger was unaware of impending danger. Gasquet was not made aware of impending danger immediately preceding the accident and certainly cannot have a duty to protect himself from a danger of which he was unaware.
Ratcliff, supra, found that the force of the impact of the boat with the wake and not the failure of the guest passenger to support himself caused the accident. Similarly the force of the impact of the airboat with the sandbar and not the failure of Gasquet, the guest passenger, to support himself caused the accident and injuries suffered by Gasquet.
In the case of Fontenot, supra, the court approached the question of whether a guest passenger not wearing a seat belt should be denied full recovery of his injuries if those injuries could have been prevented or minimized by the use of such a safety device. The court, however, found it unnecessary to rule on the legal questions presented by this argument due to the fact that defendants failed to show, as part of the evidence, that the plaintiff's injuries would have been prevented or minimized if he had been using such a device.
Although the parties have argued to great lengths in this case distinguishing a causal relationship between the plaintiff's conduct and the "accident" as opposed to a causal relationship between his conduct and his "injuries," we find this distinction an unnecessary one under our own analysis of the facts of the case. In view of the evidence presented in the record, we must conclude there was no showing made that the plaintiff's failure to hold on to the lip of the boat was a proximate cause of either the accident or his injuries and that the trier of fact was in manifest error in reaching this conclusion.
In view of the above, it is not necessary for the court to reach the issue of whether the doctrine of last clear chance would have been applicable in the present case.
Prior to the decision of Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975), an appellate court was allowed to remand a case to the trial court for a new trial when it was reversed by the appellate court for refusal of the trial court judge to give a proper jury charge, resulting in a jury verdict which was not based upon or guided by essential and correct legal principals.
In Gonzales, supra, however, the court specifically overruled its prior decision in Bienvenu v. Angelle, 223 So.2d 140 (La. 1969), and held an appellate court must decide the case when the entire record is before it, in the interest of judicial economy, citing Article 5, Section 10 of the 1974 Louisiana Constitution which grants appellate review of facts.
Under Gonzales, therefore, we are mandated to set damages in the present case *479 rather than remanding it to the trial court for a new trial.

DAMAGES
The plaintiff's past and future medical expenses were specifically proven in the trial court. Dr. Thomas M. Irwin, a specialist in otolaryngology, testified that on admission to West Jefferson General Hospital, Gasquet had heavy bleeding from the nose and mouth, and he was having difficulty breathing because of an inability to swallow, necessitating a tracheotomy. A torn artery above the roof of the mouth also had to be sutured to stop extensive bleeding in that area.
Through examination and X ray, Dr. Irwin said he concluded Gasquet had sustained fractures of the frontal skull and Le Fort through fractures of the facial skeleton; fractures of the nose, ethmoid sinus, and mandible; and a cerebral concussion. He explained in the Le Fort fracture the entire middle part of the face falls away from the skull and it "just shears off." He added that many of the victims of such injuries do not survive.
Dr. Irwin also described Gasquet's nose as being pushed in "like closing a telescope" and "the cheek bone was broken very much as an eggshell breaks into lots of little biddy pieces," probably between 50 and 100. He said to repair the injury he wired the jaw back together, placed arch bars between the wires and then hooked these together to make the teeth merge. Wires were then pushed through the nose and hooked over those pieces of metal to pinch the nose and hold it off the face. Below Gasquet's left eye there was a clean fracture, which was wired together, but under the right eye it was impossible to accomplish the objective of wiring due to the tiny bone fragmentation. Because the thin bone that each eye rests on was knocked out, thin sheets of plastic were fitted to the area to keep the eye from sagging down on the sinus. Additionally, on the right side it was necessary to fill the sinuses in his cheek with a balloon blown up with air to try to hold things in position. This procedure was unsuccessful, so a small steel rod was drilled in and passed from one cheek to the other and was left in place for six weeks.
Gasquet underwent a second operation on December 17, 1976, because when the balloon was removed from his right cheek it collapsed and the right eye also sank, putting a strain on the muscle and causing double vision. Another stronger wire was passed through the nose, joining the right and left cheek, and another piece of plastic was inserted under the eye.
Dr. Irwin explained that, as a result of the plaintiff's injuries, he expected his sense of smell to be virtually gone, and that he will have problems in his vision caused by inability to move his eyes together. He also expected Gasquet to have a loss of taste related to his loss of smell.
The wires remained in Gasquet's face until February 24, 1977, almost three months after the accident. Dr. Irwin testified the plaintiff's features could be improved for cosmetic reasons by further surgery. He also said that although Gasquet had recovered as much as possible as of the date of the trial, he is more prone to infections of the sinus cavities due to colds and, as a result, frequently takes antibiotics over extended periods of time. He also said he would not recommend the plaintiff resume his hobby of flying planes because of his continuing visual problem.
Dr. Howard Reitman, an ophthalmologist and expert in plastic reconstructive surgery of the eye, explained that he was consulted by Gasquet because of a problem with double vision, or diplopia, and loss of binocular vision, meaning he no longer sees out of both eyes at once. He said the plaintiff has also sustained loss of depth perception and downward dislocation of his eye and also has displacement of the lacrimal lake of his eyes, interfering with the tearing process. Dr. Reitman added that due to loss of the long barrier between the brain and the eye and the sinuses, such things as minor eye infections are now a serious threat to the plaintiff's health, as are minor head injuries. He said total repair is not possible and Gasquet must frequently take antibiotics.
*480 He also opined that in using the power saw and cutting meat, the plaintiff would be a danger to himself and others in close proximity. He said the plaintiff would encounter added risks in driving and totally prohibited Gasquet's flying. He did feel, however, that cosmetically and functionally reconstructive eye surgery would aid the plaintiff, although the probability of restoring totally normal eyesight with no double vision was "almost nill." Dr. Reitman estimated the cost of this proposed reconstructive surgery, including physician fees and hospital expenses, at approximately $20,000.
Also, in regard to proposed further surgery, Dr. Randolph A. Howes testified as an expert in the field of plastic and reconstructive surgery. He said that he recommended surgery to improve the oriental appearance of Gasquet's face and eyes, to repair multifacial scars and fractures and the tracheotomy scar, and to put his right eye on a plane with his left eye. He said to raise the plaintiff's eye he would transplant bone from another area of his body to the right eye socket and he would resculpture the bones of his face to approximate his former appearance. He also felt surgery would greatly improve his facial scarring. Dr. Howes estimated this work would require three operations at a cost of $7,500, and approximated hospital bills would amount to $11,000. He added that patients with the type of injury Gasquet sustained frequently develop emotional problems.
Noel F. Pilie, D.D.S., accepted as an expert in the field of dentistry, testified that due to the fractures the plaintiff sustained to his lower jaw there was disharmony in the way the lower jaw now closed with the upper teeth. X rays revealed the plaintiff also had one dead tooth resulting from the trauma and causing position changes of the adjacent teeth. Dr. Pilie also said due to the accident when Gasquet now moves his jaw around his back teeth are contacted, resulting in joint muscle strain which causes myofacial pain syndrome, a popping sound in his jaw, and headaches. He recommended grinding of the upper teeth, crowns of several teeth, orthodontic work and removal of wisdom teeth, and estimated his cost at $3,475, orthodontic work at $500 and removal of wisdom teeth at $300. He added that other teeth may die as a result of the accident, also requiring further dental work.
Dr. Randolph Harper, accepted by the court as an expert in the field of clinical psychology, diagnosed the plaintiff as having a traumatic neurosis resulting from the accident, and said this involved, among other things, an intense preoccupation with death and bodily functions. He recommended that he treat Gasquet with psychotherapy three times a week at $60 per session for a minimum of two years, amounting to approximately $20,000 in future treatments.
Dr. Harper's testimony was supported by Dr. Phillip Sullivan, a psychiatrist who was a witness called by the defendants. He added that on examination he found the plaintiff unable to perform work functions or enjoy recreational activities that he participated in before the accident and said although the condition would be permanent without treatment, the prognosis, with treatment, would be good. He also recommended psychoanalytic psychotherapy several times a week for at least two years.
The diagnosis of Gasquet's mental state and personality changes was confirmed by the testimony of the plaintiff's relatives, friends and business associates who described in detail the changes that he had undergone since the accident. All agreed that prior to the accident Gasquet was a happy, outgoing, alert and intelligent young man, but that now he has memory lapses; is despondent and withdrawn, jumpy and irritable; that he thinks and moves slowly; that he cannot function in a crisis; he has problems with spelling, addition and subtraction; has frequent headaches; forgets easily and often stops speaking in the middle of a sentence; is no longer able to make business decisions; lacks patience with his children; is no longer socially active; and no longer participates in sports and recreational activities that he once enjoyed, such as fishing, hunting, motorcycle riding, car *481 racing, flying, and raising and showing horses and cattle.
The plaintiff described in detail at the trial the intense suffering he endured both immediately following and for months subsequent to the accident as well as that which he continued to experience at the time of his testimony. He named a total of 28 drugs which he was still required to take on a rotating basis and established that he is still required to travel 100 to 120 miles at least twice a week to see his attending physician. He also testified that his functions of taste and smell have not returned and that he is continually preoccupied with death.
The plaintiff also introduced complete records showing that his medical expenses up to the time of trial were $17,950.
This court concludes, therefore, that the plaintiff, through the above testimony, established the following actual past and future damages by a preponderance of the evidence adduced at trial:

Past Medical Expenses: $17,950.00
Future Medical Expenses:
1. Reconstruction of eye socket
 (Recommended by Dr. Reitman) 20,000.00
2. Reconstructive facial surgery
 (Recommended by Dr. Howes) 18,500.00
3. Psychoanalysis
 (Recommended by Drs. Harper and
 Sullivan at a rate of $60 per
 session, twice a week, for
 two years) 18.000.00
4. Dental treatment and surgery
 (Recommended by Dr. Pilie) 4,275.00
5. Post and future medical travel
 expenses
 (Based on two 100 round trip
 visits per week since the time
 of the accident up to November of
 1982 at a rate of 17¢ per mile 10,200.00
 _________
Total past and future medical
expenses $88,925.00

This court is also aware that an award can be made for loss of future earnings where it appears with reasonable certainty that there will be such a loss, and courts have also held that where a plaintiff cannot perform his previous work without being a danger to himself and others there can be awarded a sum for future loss of income. Borne v. Bourg, 327 So.2d 607 (La.App. 4th Cir. 1976).
Moreover, even in cases where loss of future earnings cannot be proven with mathematical certainty, the court can nevertheless make an award for such earnings where there is such proof as reasonably establishes the claim. Jordan v. Travelers Insurance Company, 245 So.2d 151 (La. 1971).
However, we feel that in the present case the plaintiff has failed to show with any reasonable certainty that he will suffer a loss of income from the supermarket he owns. Although he argues he is no longer safely able to perform the butchering and meat inspecting aspects of his management of the store, it was established these duties were always, at least in part, performed by another employee and that Gasquet contributed to the management of the store in a variety of other ways. Although there were complaints from his mother and brother, who are partners in the business, regarding his personality changes and diminished functioning subsequent to the accident, there was no evidence he suffered any loss of income at all from the time of the accident until the time of trial; in fact, Gasquet's income tax returns for the two years prior to the trial actually showed an increase in income.
Since it does not appear, therefore, with reasonable certainty that Gasquet will actually suffer a loss of future earnings from his supermarket establishment, we will deny his request for such an award. Birdwell v. Reliance Insurance Company, 289 So.2d 574 (La.App.3d Cir. 1974); Reeves v. Gulf States Utilities Co., 327 So.2d 671 (La. App. 1st Cir. 1976).
In regard to the award for past and future pain and suffering, which this court must now act as a trial court in making, we refer to the case of Redd v. Prevost, 288 So.2d 74, 76 (La.App. 4th Cir. 1974), wherein this court said:
"* * * It is apparent that in each individual case, that a trial judge in assessing damages must take into consideration many variable factors relating to the injured party such that, while the precise personal injury sustained may be *482 similar, the result of the injury may be markedly different. If we tell a trial judge that he must look to an appellate pigeonhole to award damages in a particular set of circumstances, we would be substituting a `limited discretion' rule in place of the `much discretion' rule in Article 1934(3).
"We do not feel impelled to discuss the issue much further, because the basis of appellants' contention is the theory of uniformity of awards in personal injury cases, which was laid to rest some time ago by our Supreme Court. We believe the prevailing rule as to trial court and appellate functions in assessing damages has been clearly stated in Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963), quoting 158 So.2d 158:
`* * * When the doctrine is urged as applicable, cases relied upon may be similar in that each of them involves a similar injury such as a broken arm, the loss of an eye or eyes, or the loss of some member of the body. Thereafter, however, the similarity ceases for each case is different, and the adequacy or inadequacy of the award should be determined by the facts and circumstances peculiar to the case under consideration. The primary purpose of the judge or the jury in fixing the award in a personal injury case is to adequately compensate the injured person for his injury under the facts shown to exist in his case.'"
In following the above directives and in considering all of the testimony relating to the unique pain and suffering which has been experienced by the plaintiff as a result of the injuries he sustained in the accident and as a result of the medical repair of those injuries, in further consideration of pain and suffering which the plaintiff will continue indefinitely to experience as a result of future medical repair, mental problems and probable permanent disability to his sight, taste and smell, and in consideration of his loss of the ability to enjoy many of the productive and recreational aspects of his life in which he participated prior to the tragic accident in which he was involved, we award the plaintiff $500,000.
In arriving at the above figure, this court considered, but did not limit itself to, the awards made to plaintiffs in the following cases: Gregorie v. Hartford Acc. & Indem. Co., 348 So.2d 186 (La.App. 3d Cir. 1977); Duplechin v. Pittsburgh Plate Glass Company, 265 So.2d 787 (La.App. 3d Cir. 1972); Fairchild v. Brian, 354 So.2d 675 (La.App. 1st Cir. 1977); Eugene v. Douglas, 260 So.2d 69 (La.App. 4th Cir. 1972); Polman v. Mohasco Corp., 371 So.2d 838 (La.App. 4th Cir. 1979); Shively v. Pickens, 346 So.2d 1314 (La.App. 3d Cir. 1977); Ashley v. Roberts, 331 So.2d 539 (La.App. 1st Cir. 1976); Humphries v. Delta Fire & Casualty Company, 116 So.2d 130 (La.App. 1st Cir. 1959); Slay v. Hemstead, 206 So.2d 718 (La.App. 4th Cir. 1968); McCray v. Illinois Central Railway Company, 244 So.2d 877 (La.App. 1st Cir. 1971).
In accordance with the plaintiff's settlement agreement executed with Commercial Union Insurance Company, we also allow defendant Stonewall Insurance Company a credit of $300,000, making the total award to be paid James F. Gasquet, Jr., by Stonewall Insurance Company $288,925.
Additionally, this court orders the defendants Stonewall Insurance Company and H & B Construction Company of Louisiana, Inc., to pay all costs of the proceedings in the trial court, the appellate court, and the following expert witness fees:

Dr. Thomas M. Irwin $150
Dr. Howard Reitman 150
Dr. Randolph A. Howes 150
Noel F. Pilie, D.D.S. 150
Dr. Randolph Harper 150
Dr. Philip Sullivan 150
John H. Prehtel 100
Ken Grevemberg 100
George Poppas 100
Tracey J. Beard 50

Accordingly, the trial court decision is reversed and rendered.
REVERSED AND RENDERED.
SAMUEL and GULOTTA, JJ., dissent with written reasons.
*483 SAMUEL, Judge, dissenting.
I agree with the reasons expressed in the dissenting opinion of Judge Gulotta. In addition, in my view an airboat is clearly and obviously a very dangerous means of transportation and plaintiff had to be aware of this. The dissenting opinion with which I agree points out that plaintiff had been a passenger in the airboat on three or four occasions prior to the accident in suit.
As I would not disturb the jury finding, I respectfully dissent.
GULOTTA, Judge, dissenting.
I respectfully dissent.
While I concur with the majority conclusion that strict liability is not applicable in this case, and also with the conclusion that the operator of the airboat was negligent, I am of the opinion that the record supports the jury's conclusion that plaintiff "... by a failure to use ordinary care under the circumstances for his own safety contribute[d] to the injury he may have suffered." Accordingly, I would affirm the jury verdict dismissing plaintiff's suit.
It is clear from the facts of this case and well articulated in the majority opinion that Gasquet, a guest passenger in the airboat, did not in any way contribute to the accident. The more difficult problem is whether plaintiff's actions contributed to and were the proximate cause of his injury.
Well settled is the rule that contributory negligence is conduct on the part of the plaintiff which falls below the standard to which he should conform for his own safety and protection, that standard being that of a reasonable man under like circumstances. See Straley v. Calongne Drayage & Storage, Inc., 346 So.2d 171 (La.1977); Smolinski v. Taulli, 276 So.2d 286 (La.1973). Further, in White v. State Farm Mut. Auto Ins. Co., 222 La. 994, 64 So.2d 245 (1953), the Supreme Court stated:
"However, a guest may be denied recovery on the ground of contributory negligence in instances where he is guilty on his own part of independent negligence of such a nature, that, but for which, his injuries would not have been sustained." 64 So.2d at 249.
In contributory negligence cases each case must be determined on its own facts. McKowen v. Gulf States Utilities Co., 358 So.2d 675 (La.App. 1st Cir. 1978). Furthermore, where one knows or, in the exercise of ordinary care, should have known and appreciated the existence of a danger from which injury reasonably might be anticipated, he must exercise ordinary care to avoid such injury. See Veal v. Employers Liability Assurance Corporation, 108 So.2d 242 (La.App. 2nd Cir. 1958); Spears v. American Fidelity & Casualty Co., 123 So.2d 513 (Orl.La.App.1960); Jones v. Fireman's Fund Ins. Co., 298 So.2d 337 (La.App. 3rd Cir. 1974).
The finding by the jury that Gasquet's contributory negligence was his failure to use ordinary care for his own safety is predicated on a credibility determination. In this connection, the jury was obviously confronted with whether Boudreaux, the airboat operator, had warned plaintiff to "hold on" while the boat was running; whether in fact plaintiff was holding on immediately prior to and at the time of the accident; and if indeed plaintiff was holding on to the boat, (assuming that the jury believed that he did not) his injuries would have been prevented.
Admittedly, the evidence relating to these questions is contradictory. Lloyd Boudreaux, the airboat operator, stated that after they had gone through the pipe canal and before they had reached the "little crooked" canal, he stopped the boat and while Walnut (Walter Lathan) was wrapping decoys, sitting on the side of the boat, he told Gasquet:
"We're going to go over a sandbar. Get Walnut, tell him to come sit down and hold on. We're going to jump that sandbar. He said, `Okay.' So Walnut-he pulled Walnut close to him and Walnut came over and sat down in the seat where *484 he was on the opposite side. He also put his hands in his pocket and was leaning over."
Boudreaux described plaintiff as leaning over with his head crouched down close to his knees and with both hands in his pockets.
While admitting that conversation could not be heard when the motor was running at a fast speed, Boudreaux stated he told Gasquet to hold on while the boat was stopped, and that Gasquet indicated he understood the warning by answering "okay." Walter Lathan, the passenger in the boat with Gasquet at the time of the accident, stated that he did not recall or remember whether Boudreaux told him to hold on while riding in the airboat. Gasquet, on the other hand, stated that he had been a passenger in the airboat on three or four prior occasions in the same area where the accident happened but had received no instructions of any kind concerning riding in an airboat. He testified further that when Boudreaux picked him up, Lathan was in the boat. The engine of the boat was off and the boat was stopped and not idling. When the engine restarted, Gasquet was seated in the right seat and Walnut Lathan was standing up. Boudreaux tapped plaintiff on the shoulder and made a motion for him to have Walnut sit down. Whereupon plaintiff reached over and grabbed Walnut by the pants leg and pulled him back.
Although I fail to find from plaintiff's testimony that Boudreaux did in fact tell Gasquet to "hold on", according to Gasquet he was holding on with one hand at the time of the crash. He explained that this was his natural habit. When confronted with an earlier deposition in which he stated he was not sure whether he was holding on at the time of the accident, Gasquet insisted that he was certain that he had been "holding on" when the crash occurred.
As pointed out in the majority opinion, opportunity was afforded to the panel to view sound movies of the operation of the airboat. While it is true, as indicated by Gasquet, that no seat handles were provided on the seats in which he and Lathan were seated, it is clear from observation of the movies that the leg of the operator's chair (perched in the middle of the boat and above the passenger seats) was easily accessible to plaintiff for holding on securely with his left hand. The lip or edge of the boat was also easily accessible and available for holding on with his right hand.
Significant also is Boudreaux's testimony that although Lathan and Gasquet were violently thrown forward when the boat made a sudden stop on the sandbar, he (Boudreaux) remained in his seat. Boudreaux stated that he had one hand on an armrest, the other hand on the control lever and his foot on the accelerator. Lathan testified that because of the cold weather he had his hands in his pockets when they were riding in the airboat.
It is clear that the jury's finding (that plaintiff failed to use ordinary care for his own safety) is based on the acceptance of Boudreaux's testimony that he gave adequate warning to Gasquet, which was understood by plaintiff, and that plaintiff was not holding onto the boat at the time of the accident, but had his hands in his pockets.
The evidence considered, I cannot say the jury's evaluation of that evidence is unreasonable.[1]
Finally, the jury could have reached a reasonable conclusion that if Gasquet were holding on to the airboat at the time of the accident, he would not have sustained the injuries. The jury had ample evidence to conclude that places were available for plaintiff to hold onto the airboat; that Gasquet failed to do so; that plaintiff had his *485 hands in his pockets at the time of the crash; and, that the operator of the boat, holding on with one hand, remained in the airboat.
Confronted with these circumstances and these apparent reasonable evaluations and conclusions of the jury, I cannot say that manifest error was committed when the jury dismissed plaintiff's suit. Accordingly, I would affirm the judgment of the trial court.
NOTES
[1] Quoting favorably from White v. State Farm Mut. Auto Ins. Co., 64 So.2d 245 (La.1953).
[1] Reasonable evaluations of credibility and reasonable inferences of fact are not to be disturbed although we may feel that our own evaluations and inferences are as reasonable. See Canter v. Koehring Company, 283 So.2d 716 (La.1973). Nor can I come to the conclusion that the findings on contributory negligence were clearly wrong. See Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).