354 So.2d 675 (1977)
Helen FAIRCHILD and Russell Fairchild
v.
C. Verne BRIAN et al.
No. 11522.
Court of Appeal of Louisiana, First Circuit.
December 28, 1977.
Rehearing Denied February 13, 1978.
*676 Bert K. Robinson, W. P. Wray, Jr., Baton Rouge, of counsel for plaintiffs-appellants Helen and Russell Fairchild.
Donald T. W. Phelps, Baton Rouge, of counsel for defendants-appellees Stanocola Employees Medical and Hospital Association & St. Paul Fire and Marine Ins. Co.
Victor L. Roy, III, Baton Rouge, of counsel for defendant-appellee C. Verne Brian.
Frank M. Coates, Jr., Baton Rouge, of counsel for defendant-appellee Stanocola Employees Medical and Hospital Association.
Before LANDRY, BLANCHE, COVINGTON, CHIASSON and EDWARDS, JJ.
CHIASSON, Judge.
Helen and Russell Fairchild, husband and wife, instituted this action to recover damages for the alleged tortious acts of defendants, Stanocola Employees Medical and Hospital Association and C. Verne Brian, an optometrist in the Stanocola Clinic, resulting in the loss of vision in Mrs. Fairchild's right eye. The defendants' insurer, St. Paul Fire and Marine Insurance Company, was joined as a party defendant.
The trial court dismissed the plaintiffs' suit, concluding that the plaintiffs had failed to prove by a preponderance of the evidence that defendants' negligence was a proximate cause of her damages. The plaintiffs have appealed this adverse decision. We reverse.
We adopt the following findings of facts by the trial court:
"Stanocola is an association which provides medical services to its dues-paying members. Plaintiffs have been members and have paid dues for approximately 32 years.
"In December of 1973, while Mrs. Fairchild was baking Christmas cookies, she realized that she had difficulty seeing out of her right eye. . . .
"She telephoned Stanocola and spoke to one of the women at the appointment desk. Plaintiff informed the woman that she was having trouble with her eye and desired to make an appointment to see the eye doctor. She was told that she could have an appointment with `Dr. Verne Brian' on January 8, 1974. At the time she made the appointment there was no discussion or questions relative to `Dr. Brian' being an optometrist.
"On January 8, 1974, Mrs. Fairchild entered Stanocola, paid a $2.00 registration fee and was given a receipt indicating that she was to see `a specialist.' Her vision was initially tested by Mrs. Claudell Talley, a registered nurse. Mrs. Talley checked Mrs. Fairchild's visual acuity which she recorded on her chart to be 20/60 in the right eye without glasses and 20/40 with glasses; left eye without glasses 20/60 and 20/25 with glasses.
"`Dr. Brian' then examined Mrs. Fairchild, administering local anesthetic drops in the cul-de-sac of each eye, and utilizing the ophthalmoscope, phoropter, retinoscope and tonometer. He noted on the chart that the intraocular pressure in each eye was within normal limits. He did, however, find a breakdown in the structure of the lens of the right eye, or an opacity of the lens which he noted on the chart as `Lens changes O.D.' He saw nothing wrong with the retina of the right eye at this time.

*677 "Brian diagnosed Mrs. Fairchild's problem to be an early senile cataract. He told plaintiff that she had a cataract. Mrs. Fairchild questioned the diagnosis, however, upon reexamination, `Dr. Brian' again confirmed her problem to be a cataract.
"Mrs. Fairchild also complained that her eye was sensitive to sunlight so `Dr. Brian' suggested that she purchase dark glasses to remedy this problem. Brian then told Mrs. Fairchild that if her condition worsened, the cataract could be removed surgically. Mrs. Fairchild testified that Brian did not advise her to restrict her activities.
"Subsequent to the examination, Mrs. Fairchild purchased the dark glasses and went about her business.
"Brian testified that he had no independent recollection of examining plaintiff except for his notations on her chart. He deduced, from the chart, that he had placed local anesthetic drops in each eye, which he had been authorized to do by Dr. Hebert. He confirmed having examined her with the ophthalmoscope, phoropter, retinoscope and tonometer.
"He further testified that he did not examine plaintiff's eyes with a slit lamp microscope because, to do so, required a dilating of the eyes which he was prohibited, by law, from doing.
"Brian candidly admitted that her eyes probably should have been dilated, however, the frequency of lens changes in the older members of Stanocola made this impractical. He further testified that, theoretically, any condition diagnosed as cataract should be referred to Dr. Hebert. However, practicality dictated an understanding between Brian and Hebert that patients would not be referred until their visual acuity dropped to 20/50 or 20/60.
"Between January 8, 1974, and March 19, 1974, the date of her next visit to Stanocola, the blurring in Mrs. Fairchild's right eye increased. While watching television one evening, she suddenly realized that she could not see out of her right eye. She telephoned Stanocola and asked to see Dr. Hebert, an ophthalmologist. She was given an appointment for March 19, 1974.
"She again paid the $2.00 registration fee to see the specialist, this time, Dr. Thomas Hebert. The doctor examined her eyes and told her that she did not have a cataract, but rather `deep trouble.' After he had completed the examination, Dr. Hebert informed Mrs. Fairchild that she had a detached retina which required immediate surgery. Mr. Fairchild was sent home with specific instructions not to drive, bend, stoop or lift anything over three or four pounds.
"Dr. Hebert testified that he examined Mrs. Fairchild on March 19, 1974. Prior to examination, he authorized Mrs. Talley to dilate plaintiff's eyes and Brian to administer a local anesthetic. Like Brian, Hebert had no independent recollection of the examination.
"Upon examination of the right eye he discovered a retinal detachment on the temporal (right) side involving the macula and fixed folds. The folds indicate that the detachment occurred long enough ago to allow the retina to scar. . . .
"Dr. Hebert further testified that time did not permit him to see every patient at Stanocola with early senile cataracts. If he did, he stated that he would see virtually every patient at Stanocola. The doctor testified that he would have had Verne Brian refer Mrs. Fairchild to him, considering her degree of visual acuity, within three to six months.
"Dr. Hebert referred plaintiff to Drs. Walter Cockerham and Ralph Nix in New Orleans for surgery. Dr. Cockerham, an ophthalmologist, reattached plaintiff's retina, utilizing the scleral-buckling procedure. In addition to the detached retina, the doctor treated plaintiff for von Hippel-Lindau disease, a progressive congenital tumor beneath the retina. The incidence of this condition is rare. Dr. Cockerham attacked the tumor by freezing and burning it. The tumor subsequently caused another detachment requiring a second surgery. In the second *678 surgical procedure the tumor was successfully contained.
"Dr. Cockerham testified that there still exists some residual detachment and that he doubted that plaintiff would ever regain normal vision in the right eye. . . .
"The evidence further revealed that Stanocola hired its first optometrist, C. Verne Brian, for the primary purpose of doing eye refractions. Brian's employ in the capacity of optometrist was not officially publicized and, thus, the members of the Association were not familiar with the man or his title.
"Brian's name was posted on a directory under `Eye Department.' The directory was located behind the central admissions desk. The directory listing said:
`EYE DEPARTMENT
Dr. T. Hebert
Dr. C. V. Brian'
"Mr. Tom Cooper, Stanocola's Business Administrator, testified that a sign saying `Dr. C. V. Brian' was also placed on the door in the waiting room of the eye department. The personnel at Stanocola all referred to Brian as `Dr. Brian.'
"The evidence further preponderates that members of Stanocola were not informed that `Dr. Brian' was an optometrist rather than a medical doctor or ophthalmologist. Neither were there any signs or notices distinguishing Brian's title from Dr. Hebert's (e. g., `O.D.', `Opt.', or `D.O.S.').
"The general procedure at Stanocola apparently calls for the ladies at the appointment desk to screen the various patients according to their symptoms. After hearing the symptoms or complaints, the receptionists determined whether the patient was to be referred to Dr. Hebert or Brian. The ladies possessed no formal medical training, nor were they given any written guidelines, so as to know which patients to refer to which person. The women did not inform the members of the difference in title, unless specifically asked.
Dr. Lamar Lambert, the Medical Director of Stanocola, testified that if Brian "found a medical condition, which a cataract is a medical condition, he was to refer it to Dr. Thomas Hebert." Dr. Lambert further testified that Brian was to classify the different types of cataracts and was to make the decision as to when the patient was to be referred to Dr. Hebert.
We further adopt the following holdings of the trial court:
"The evidence clearly preponderates that Verne Brian was in direct violation of R.S. 37:1061(5) and (15). The Court believes that defendant, Brian, knew or should have known that his name was being improperly displayed to the patients at Stanocola. As far as this Court is concerned, the members of Stanocola, or at least two of them, Helen and Russell Fairchild, were deceived by this flagrant impropriety which raises the possibility of a violation of R.S. 37:1061(9).
"Stanocola Employees Medical and Hospital Association used the title `Doctor' for Verne Brian, held him out to its members as a `Doctor' and placed his name on the directory behind the appointment desk as `Dr. C. V. Brian', just below `Dr. T. Hebert.' Stanocola further bestowed the title of `Specialist' on Dr. Brian. This inexcusable charade, acquiesced in by Brian, placed Stanocola in no less a culpable posture. The Fairchilds, as well as all other members of the Association, had the right to know the correct title of Verne Brian, and Stanocola and Brian had the duty to divulge this information. Albeit, disciplines other than those holding M.D. degrees are entitled by law and custom to be called `doctors', nevertheless, the title should not be used under circumstances violative of the law, and in such a manner as to deceive or take advantage of others.
"The Court further finds that Verne Brian, under the direction and with the permission of Stanocola personnel, practiced medicine at Stanocola without a license.
"Defendants appear to be more interested in engaging in a tactical battle of *679 semantics. However, the inescapable conclusion is that Verne Brian, with the active assistance of Stanocola, diagnosed and treated cataracts or diseases of the eye. Brian also `treated' or relieved (see R.S. 37:1261) by (1) prescribing dark glasses; (2) directing plaintiff to return home and engage in normal activities; (3) instructing plaintiff to return for routine examination for the cataract; (4) deciding not to refer plaintiff to Dr. Hebert; and (5) advising plaintiff that the condition was progressive and might require surgery.
"The Court does not doubt that Verne Brian, D.O.S., is an expert in his field. However, his expertise in the field of optometry bears no relevancy whatsoever to the practice of medicine. The law has been calculating in drawing a jurisdictional line between the areas of optometry and ophthalmology. Verne Brian and Stanocola have illegally traversed this line.
"Testimony elicited from Drs. Hebert and Oliver as to the necessity of the referral system is, as far as this Court is concerned, without merit. The impracticality and inconvenience of seeing patients with eye disease are miniscule when compared to the risks of losing one's eyesight.
"Defendant suggests that the educational background of Brian and the testimony of Drs. Hebert, Cockerham, Oliver and William Risinger, regarding the competency of Brian and the reasonableness of his actions, must be considered. The Court disagrees when such conduct falls in direct violation of the law.
"The Court is also aware of the general rule that the standard of care against which the conduct of a professional accused of malpractice is that degree of skill and care ordinarily employed under similar circumstances by other members of his profession in good standing in the same community where he practices, and to use reasonable care and diligence, along with his best judgment in the application of his skill to a given case. Meyer v. St. Paul Mercury Indemnity Company, 225 La. 618, 73 So.2d 781 (1954).
"However, the Court is equally aware of the jurisprudential authorities which hold that a negligent standard of care does not constitute a valid defense; Favalora v. Aetna, 144 So.2d 544 (La.App. 1st Cir. 1962) Cert. Denied.
"Defendants have averred that Brian has exercised his optometric skills in a good and reasonable manner. This is probably correct insofar as his optometric skills are concerned. However, Verne Brian, assisted by Stanocola, transcended the bounds of optometry and, in so doing, is subject to the same rules relating to the duty of care and liability as the ophthalmologist. See Butler v. Louisiana State Board of Education, 331 So.2d 192 (La. App. 3rd Cir. 1976). Rehearing Denied.
"The testimony and evidence have clearly established that early senile cataract is an eye disease. Further, the reasonable standard of care among ophthalmologists would be to dilate the eye subsequent to an initial determination that a cataract exists. Thus, the Court has no alternative but to conclude that defendant Brian was negligent and that such negligence is imputed to his employer, Stanocola."
The trial court thereafter determined that defendants' negligence was not a proximate cause of plaintiffs' damages. The basis for the trial court's holding was that the crucial question was whether or not plaintiffs had proven by a preponderance of the evidence that Mrs. Fairchild had a retinal detachment on January 8, 1974. We disagree and hold that the crucial question is whether or not plaintiff's failure to receive the proper standard of care contributed to her injury.
In holding that the plaintiffs had failed to carry their burden of proof the trial court relied in part upon his finding that Dr. Marks had made a statement to the effect that if the angioma was peripheral, it would not even have been seen in the dilated eye. The trial court was in error in this finding because a careful review of Dr. Marks' testimony does not reveal any such statement made by him. To the contrary, *680 his testimony was that in the undilated eye a peripheral angioma would not be seen. His testimony on this point is in accord with the other ophthalmologist who testified in this case to the effect that it would have been necessary to dilate Mrs. Fairchild's eye in order to view the peripheral area of her eye. The evidence is overwhelming that Mrs. Fairchild's eye should have been dilated, and the only reason this was not done was because of Brian's negligence in not referring her to a qualified ophthalmologist.
Drs. Hebert and Cockerham did not examine Mrs. Fairchild for cataracts or opacity of the eyes, and the only ophthalmologist who did examine her for cataract was Dr. Marks who testified that the lenticular aberration was essentially the same in each eye. Dr. Marks further testified that while it is true that some lens opacity in some people cause more blurring than the same lens opacity in another, it is very unusual or virtually impossible for the same amount of lens opacity in the same person to cause different vision in the two eyes. To say that lens opacity can cause visual acuity, such as Mrs. Fairchild had, does not explain the disparity in vision for one with bilateral cataracts. Had Mrs. Fairchild's eyes been dilated in January, 1974, and a finding of opacities such as Dr. Marks made, with a known disparity of 20/25 and 20/40, an ophthalmologist would have known that there must have been some other reason for the loss of central vision and would have therefore performed other tests to determine the cause of the disparity. If the cause could not have been discovered at that time, an ophthalmologist would have closely supervised the case until the cause could have been determined. The only reason that we do not know the condition of Mrs. Fairchild's eyes on January 8, 1974, is because of the failure of defendant Brian to refer her to an ophthalmologist who would have dilated her eyes and would have viewed the peripheral area of the eye where the angioma was located. To speculate as to what an ophthalmologist may or may not have found in an examination of Mrs. Fairchild in January of 1974, is, as all expert ophthalmologists who testified in this case stated in one way or another, sheer guess work. We do know that one trained in pathology and diseases of the eye would have done more than Brian did to discover the cause of Mrs. Fairchild's eye problem.
The delay in discovering the detached retina until it was too late to save the sight of the right eye is directly attributable to the failure of defendants to provide Mrs. Fairchild with the applicable standard of care.
Defendants, in the alternative, aver that plaintiff was contributorily negligent in failing to seek the proper medical attention that a reasonable person would have sought under the circumstances. We do not find plaintiff contributorily negligent because she had been reassured as to what her trouble was and had been led to believe that a qualified medical doctor had diagnosed her problem to be cataract which could become progressively worse and eventually corrected by surgery.
Turning our attention to the amount of damages, the evidence substantiates a finding that Mrs. Helen Fairchild has suffered, for all practical purposes, a permanent loss of the sight of her right eye or impairment thereto, equivalent to such a loss. Considering Mrs. Fairchild's age, the nature, extent and permanence of her injury, we shall award to her the sum of $25,000.00, and shall award to Mr. Fairchild the sum of $2,722.15 for medical expenses incurred as a result of said injury.
Accordingly, the judgment of the trial court dismissing plaintiffs' suit at their costs is reversed and judgment is rendered in favor of Mrs. Helen Fairchild and against the defendants, C. Verne Brian, Stanocola Employees Medical and Hospital Association and St. Paul Fire and Marine Insurance Company, in solido, in the sum of Twenty-Five Thousand and No/100 ($25,000.00) Dollars; and judgment is rendered in favor of Mr. Russell Fairchild and against the defendants, C. Verne Brian, Stanocola Employees Medical and Hospital Association and St. Paul Fire and Marine Insurance Company, in solido, in the sum of *681 Two Thousand, Seven Hundred Twenty-Two and 15/100 ($2,722.15) Dollars, both sums with legal interest thereon from date of judicial demand, until paid.
All costs of this appeal and in the trial court, including the expert witness fees, as set out in the trial court's judgment, are assessed against defendants.
REVERSED AND RENDERED.
COVINGTON, Judge, dissenting:
I agree that Mrs. Fairchild was not contributorily negligent. Further, the action of Stanocola, which very possibly could have led her to believe that she was seeing an ophthalmologist, not an optometrist, is not to be admired. Nevertheless, regardless of how much we may deplore or disapprove of such mode of conduct, no matter how reprehensible it may be thought to be, irrespective of the negligence of Dr. Brian and Stanocola, the trial judge correctly considered proximate cause as the focal issue and resolved it adversely to the plaintiffs. I concur therein.
In a tort action, a basic inquiry is always whether any casual relationship exists between the harm and the alleged negligent conduct. See Tiger Well Service, Inc. v. Travelers Insurance Co., 343 So.2d 1158 (La.App. 3 Cir. 1977). In the instant case the trial judge concluded that the defendants' negligence in having an optometrist to diagnose eye pathology and in failing to dilate the eye which the local standard of care required under the circumstances had no casual relationship to Mrs. Fairchild's retinal detachment and resultant harm to her. In reviewing the record in this case, there is a reasonable factual basis for this conclusion.
The record reveals that the plaintiffs' experts, Drs. Marks and Jones, both ophthalmologists, one who examined the patient several months after the retinal surgery and the other who examined and gave an opinion from the medical records only, testified that a retinal detachment was probably present on January 8, 1974. Dr. Hebert, who was one of the treating physicians and the one who first detected the retinal detachment, expressed the opinion that, more probably than not, the retinal detachment was not present on the date in question. Dr. Cockerham, the retinal surgeon, opined that the retinal detachment occurred six to eight weeks prior to his examination, placing the time of detachment seven to twenty days after the January date. Both Drs. Hebert and Cockerham testified on behalf of the defendants, as did Dr. Oliver, an ophthalmologist, who testified that from the medical records he saw nothing to indicate a retinal detachment on January 8, 1974.
Even though the expert witnesses' testimony differed on this point, it is largely a matter of fact for the trial judge to determine the most credible evidence and a finding of fact in this regard should not be overturned unless manifest error appears in the record. Green v. State, Southwest Louisiana Charity Hospital, 309 So.2d 706 (La.App. 3 Cir. 1975), writ denied, 313 So.2d 601 (La.1975).
Moreover, the evidence supports the trial judge's conclusion that blurring on the temporal side of the right eye, as complained of by Mrs. Fairchild, is not consistent with a temporal detachment of the retina of the right eye, the eye condition for which surgery later became necessary. Mrs. Fairchild testified that she was experiencing a blurring of the vision in the right (temporal) corner of the right eye, which led her to make the January 8, 1974, appointment at Stanocola clinic. Drs. Hebert and Cockerham described the retinal detachment in Mrs. Fairchild's right eye as being located in the temporal area, or the right corner of her eye.
Dr. Jones testified that a description of temporal blur in the right side of the eye would be inconsistent with the finding of a temporal retinal detachment (which would produce a nasal field defect). Dr. Marks testified that Mrs. Fairchild's symptom of blur on the temporal side of her eye would be difficult to explain as a temporal retinal detachment. Dr. Risinger, an optometrist, also testified that a temporal detachment would showup as a nasal field defect. Finally, Dr. Oliver testified that a blurring of vision in the temporal area of the right eye *682 would be inconsistent with a detached retina in the temporal area. This testimony establishes a factual basis for the trial court's finding that the symptom of blurring of the right side of the right eye was not consistent with a detachment on the right side of the retina of the eye.
It is now settled that a determination made by the trier of fact is not to be reversed on appeal if there is credible evidence in the record reasonably supporting the factual findings. This rule was recently reaffirmed in Dyson v. Gulf Modular Corporation, 338 So.2d 1385 (La.1976), where the standards announced in Canter v. Koehring Company, 283 So.2d 716 (La.1973), were restated to the effect that even if another interpretation or conclusion to be drawn from the facts is equally as reasonable as that found by the trial judge, the appellate court is not to substitute its own version of the facts for that of the trier of fact.
The findings of fact made by the trial judge in determining the issue of proximate causation in the instant case are supported by credible evidence contained in the record. He committed no manifest error in those findings, and his decision should be affirmed.
Therefore, I respectfully dissent.