517 So.2d 1072 (1987)
Gordy SMITH, et al., Plaintiffs-Appellants,
v.
STATE of Louisiana, Through the DEPARTMENT OF HEALTH & HUMAN RESOURCES, Defendant-Appellee.
No. 86-925.
Court of Appeal of Louisiana, Third Circuit.
October 7, 1987.
Writ Granted December 18, 1987.
*1073 Russell T. Tritico, Lake Charles, for plaintiffs-appellants.
*1074 Provosty, Sadler & Delaunay, Fred B. Alexius & Steve Wheelis, Alexandria, for defendant-appellee.
Before STOKER and YELVERTON, JJ., and CULPEPPER, J. Pro Tem.[*]
WILLIAM A. CULPEPPER, Judge. Pro Tem.
Effie Smith (hereinafter decedent) died on December 11, 1982, in the emergency room of Huey P. Long Memorial Hospital in Pineville, Louisiana. Decedent's husband, Gordy Smith, and her twelve children (hereinafter plaintiffs) filed suit for damages for her wrongful death against the hospital and the attending physician, Dr. Edward Staudinger (hereinafter defendants). After trial on the merits, the judge dismissed the plaintiffs' suit finding that although defendants were negligent, there was no causal connection between defendants' negligence and the death of Effie Smith. Plaintiffs appealed, and defendants answered the appeal contesting the court's finding of negligence. We affirm.

FACTS
At approximately 7:30 P.M. on December 10, 1982, Effie Smith, accompanied by her son and daughter, was admitted to the Huey P. Long Charity Hospital in Rapides Parish, Louisiana, complaining that she "had been feeling bad for the past week" and had shortness of breath. On admission, her vital signs were taken, which revealed that her blood pressure was elevated. She was examined by Dr. Edward Staudinger, the emergency room physician, who determined that she had mild edema of the extremities and shortness of breath. After concluding that the patient appeared in no acute distress, Dr. Staudinger ordered a Lasix of 20 milligrams, a chest X-ray and an EKG. The orders were recorded on the chart at 8:05 P.M.
Nurse Anthony Gomez testified that he administered the Lasix, which is a diuretic designed to reduce blood pressure, at approximately 8:05 P.M. A chest X-ray was taken and examined by Dr. Staudinger between 9:00 and 9:30 P.M. After viewing the X-ray, Dr. Staudinger informed the patient's family that he had no reason to admit her to the hospital based on the results that he had obtained so far. A request for an EKG was charted at 9:15 P.M. by Nurse Gomez.
Nurse Everett Lofton replaced Nurse Gomez at approximately 11:15 P.M. Upon examination, Nurse Lofton determined that the patient was awake, lethargic, and her skin was cool. Decedent's daughter, who had remained in the room with decedent since her admission, testified that she left the room sometime after 11:00 P.M. to make a telephone call. When she returned ten to fifteen minutes later, she found that decedent had gone into cardiac arrest and was being given CPR by Dr. Staudinger and Nurse Lofton.
Nurse Lofton testified that as he was making his rounds between approximately 11:30 and 11:45 P.M., he saw that the decedent was in distress and determined that she had apnea (breathing difficulties) and a faint pulse. He summoned Dr. Staudinger, who was examining the EKG at the time.
The electrocardiogram (EKG) results were reported at approximately 11:45 P.M. After Dr. Staudinger examined the results, he determined that decedent had atrial fibrillation, which is an irregular heart rhythm. He testified that decedent was not in cardiac arrest at the time the EKG was taken. He further testified that as soon as he examined the EKG, Nurse Lofton summoned him to respond to decedent's cardiac arrest.
Dr. Staudinger and Nurse Lofton administered CPR to the decedent for approximately 45 minutes. Decedent never responded, and was pronounced dead at 12:37 A.M. on December 11, 1982.
No further notations were indicated on the chart after 9:15 P.M. until Nurse Lofton initiated a flow sheet subsequent to Effie Smith's death. Decedent's daughter, who had constantly remained in decedent's *1075 room until she left to make a telephone call, testified that no one checked on the decedent during the interim between the chest X-ray and the cardiac event. The nurses testified that although they did not specifically recall rechecking decedent's vital signs, the chart would have reflected any acute changes in her condition. Several expert medical witnesses, including Dr. Staudinger, testified that they did not believe that the chart documentation was adequate in this case. The experts agreed, however, that the initial orders given by Dr. Staudinger and the care administered subsequent to the cardiac arrest were adequate and appropriate for this patient.
In his reasons for judgment, the trial judge found that the records in this case were grossly inadequate, which was contrary to standard medical procedures. He also determined that the taking of the EKG three hours and forty-five minutes after it was ordered was a significantly long delay. The court concluded that the medical attention and treatment administered to the decedent were negligent and below the standard of care required for emergency room treatment in the area. However, the trial judge dismissed plaintiffs' suit for the plaintiffs' failure to prove a causal connection between defendants' negligence and Effie Smith's death.
Plaintiffs appeal the trial court's judgment, asserting the following assignments of error:
(1) The facts do not support the court's decision on the question of causation;
(2) The court failed to impose on the defendants the burden of affirmatively showing that their failure to adequately monitor the decedent would not have prolonged her life, once negligence had been established;
(3) The court failed to consider that once negligence was established, the decedent lost any chance of survival; and
(4) The court should have applied res ipsa loquitur in this case.
Defendants answered plaintiffs' appeal, asserting that the trial court erroneously found that the medical treatment and attention afforded decedent were negligent and below the area standard of care required for emergency room treatment.

BURDEN OF PROOF
In a medical malpractice action based on the negligence of a physician, the plaintiff bears the burden of establishing the doctor's deviation from the standard of care required by others in the same field. Plaintiff also must establish a causal relationship between the doctor's alleged negligence and the injury resulting therefrom. LSA-R.S. 9:2794; Banda v. Danburg, 469 So.2d 264 (La.App. 1 Cir.1985).
In cases alleging medical malpractice against a hospital, the plaintiff must demonstrate: (1) that the hospital owed the plaintiff a duty which was imposed to protect against the risk involved; (2) that the hospital breached that duty; (3) that the plaintiff suffered an injury, and (4) that the hospital's actions were a substantial cause in fact of the injury. Biggs v. U.S., 655 F.Supp. 1093 (W.D.La.1987); Belmon v. St. Frances Cabrini Hosp., 427 So.2d 541 (La. App. 3 Cir.1983).
The standard of care applicable to hospitals was set forth by the Louisiana Supreme Court as follows:
"A hospital is bound to exercise the requisite amount of care toward a patient that the particular patient's condition may require. It is the hospital's duty to protect a patient from dangers that may result from the patient's physical and mental incapacities as well as from external circumstances peculiarly within the hospital's control. A determination of whether a hospital has breached the duty of care it owes to a particular patient depends upon the circumstances and the facts of that case."
Hunt v. Bogalusa Community Medical Center, 303 So.2d 745, at page 747 (La. 1974).
Dr. Staudinger testified that upon initial examination of the decedent, he determined that she had some hypertension and/or mild congestive heart failure. Plaintiffs' expert medical witness, Dr. Eli Sorkow, *1076 testified that if the doctor had suspected any cardiac problems, the patient should have been put on a cardiac monitor and observed fairly closely by the nursing personnel. Dr. Staudinger testified that, had he received the EKG results sooner, he would have started another line of treatment, which would have included cardiac monitoring and obtaining a medical consultant.
The experts concluded that decedent's condition required continued monitoring and that charting should have been done on a regular basis. The experts also agreed that the lack of documentation indicated that no one was properly observing the decedent, based on the standard maxim "not charted, not done." Dr. Staudinger admitted that the charting was not adequate in this case and that in retrospect he would have told the nurses to add more documentation.
The evidence indicates that decedent was not adequately monitored in this case. The nurses did not specifically recall the patient, and thus the best evidence of their actions would have been the documentation on the chart. The experts agreed, as did the treating physician, that the charting was inadequate in this case. Dr. Staudinger also conceded that the four hour delay in obtaining the EKG would not have met his usual standards.
Based on the evidence presented in the record, we conclude that the trial court was not clearly wrong in its finding of negligence on the part of defendants. Our next issue for determination is whether or not the trial court properly found a lack of causation between the defendants' negligence and the death of Effie Smith.
Plaintiffs, relying on the res ipsa loquitur doctrine, a rule of evidence, contend that once negligence was established, the burden shifted to the defendants to go forward with proof to nullify the inference that it was not their negligence that caused the death.
In order for the doctrine of res ipsa loquitur to be applicable, it must be shown that: (1) the accident is of a kind which does not normally occur in the absence of negligence; (2) the accident was caused by an instrumentality in the actual or constructive control of the defendant; and (3) the information as to the true cause of the accident was more readily available to the defendants than the plaintiffs. Culver v. Ochsner Foundation Hosp., 474 So.2d 984 (La.App. 5 Cir.1985), writ den., 477 So.2d 705 (La.1985). The rule applies when the facts shown suggest the negligence of the defendant is the most plausible explanation of the injury. White v. McCool, 395 So.2d 774 (La.1981); McCann v. Baton Rouge General Hospital, 276 So. 2d 259 (La.1973); Culver, supra. When the thing does not speak for itself, the burden of proof is on the plaintiff to prove by a preponderance of the evidence that the injury was the result of the defendant's negligence. Bush v. St. Paul Fire & Marine Insurance Co., 264 So.2d 717 (La.App. 1 Cir.1972), writ den., 262 La. 1180, 266 So.2d 452 (1972). Once the doctrine has been applied to a given case, the burden then shifts to the defendant to show an absence of negligence on his part. Culver, supra. The doctrine does not apply where direct evidence shows the cause of the injury. Bush, supra.
In this case, direct evidence explains the cause of death. Defendants' expert witness testified that arrhythmia, or atrial fibrillation, is a sudden event, and that the evidence indicated that the delay in obtaining the EKG did not play any role in decedent's demise. Both parties' experts conceded that the response by defendants to decedent's atrial fibrillation was timely, and that the CPR was continued for an adequate period of time. Dr. Staudinger testified that even if he had obtained the EKG earlier and placed the patient on a monitor, he did not believe that he would have been able to save her.
Based on the evidence, we conclude that the doctrine of res ipsa loquitur is inapplicable to this case. Thus, the burden remains with the plaintiffs to prove a causal connection between defendants' negligence and the death.
*1077 In order for negligent conduct to be a cause in fact of plaintiff's harm, it must be shown to be a substantial factor in causing the injury. Biggs, supra; Belmon v. St. Frances Cabrini Hosp., supra. Once a breach of duty constituting malpractice is established, the question of whether the malpractice contributed to the death, i.e., lessened the chance of survival, is a question of fact. Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713 (La.1986). A substantial factor need not be the only causative factor; it need only increase the risk of harm. Hastings, supra.
Plaintiffs rely on Hastings, supra, in support of their argument that plaintiffs in medical malpractice cases are not required to prove causation where the "loss of chance theory" applies. The Louisiana Supreme Court set forth the plaintiff's burden of proof in such cases as follows:
"It is not necessary to prove that a patient would have survived if proper treatment had been given, but only that there would have been a chance of survival. Destruction of a two percent chance of survival has been held to present a jury question as to causation.
* * * * * *
Defendant's conduct must increase the risk of a patient's harm to the extent of being a substantial factor in causing the result but need not be the only cause. Roberson v. Counselman, 235 Kan. 1006, 686 P.2d 149 (1984). Failure to afford a patient treatment which would have given him a forty percent chance of survival can be a substantial factor/cause for his death.
* * * * * *
"Thus, in a death case, if a defendant physician, by action or inaction, has destroyed any substantial possibility of the patient's survival, such conduct becomes a proximate cause of the patient's death. The law does not require the plaintiff to prove to a certainty that the patient would have lived had he received more prompt diagnosis and treatment for the condition causing the death." Brown v. Koulizakis, 229 Va. 524, 331 S.E.2d 440 at 446 (1985).
Hastings, supra, at pages 720-721.
The present case can be distinguished from Hastings and the other line of cases cited by plaintiffs, including Fairchild v. Brian, 354 So.2d 675 (La.App. 1 Cir.1977), on the basis that those cases dealt with situations where medical experts testified unequivocally that the patient would have recovered with prompt treatment. There has been no expert medical testimony presented here which would suggest that decedent would have survived if diagnosed sooner. As the experts testified, atrial fibrillation is usually a sudden event, and decedent was properly treated once she went into cardiac arrest.
In Hastings, the court held that LSA-R. S. 9:2794 does not apply when the doctrine of res ipsa loquitur applies. As we have already determined that the res ipsa loquitur doctrine is inapplicable to this case, plaintiffs still bear the burden of proving causation as set forth in LSA-R.S. 9:2794.
Under Louisiana law, no one is required to guard against or take measures to avert that which a reasonable person, under the circumstances, would not anticipate as likely to happen. Biggs, supra; Smith v. Doe, 483 So.2d 647 (La.App. 4 Cir.1986). The trial judge determined that there was no showing that the defendants' lack of attention in any way contributed to Effie Smith's death. Causation is a question of fact, and our duty on appellate review of this finding of fact requires us to affirm in the absence of manifest error. Belmon, supra. We find no manifest error in the trial court's determination that plaintiffs failed to prove a causal connection between defendants' negligence and the death of Effie Smith.
For the foregoing reasons, the judgment of the trial court is affirmed. All costs are assessed against plaintiffs-appellants.
AFFIRMED.
YELVERTON, J., dissents and assigns reasons.
*1078 YELVERTON, Judge, dissenting.
The trial judge was right in concluding that the hospital staff was negligent in failing to perform the EKG until over 3½ hours after it was prescribed by Dr. Staudinger. In my opinion, the trial judge was clearly wrong in holding that there was no legal causation between this negligence and Mrs. Smith's death.
The EKG was taken at 11:45 P.M. It had been prescribed at about 7:45 P.M. When the EKG was taken, Mrs. Smith was not in cardiac arrest. The EKG revealed an irregular heartbeat. Dr. Staudinger received the results of the EKG after Mrs. Smith had gone into cardiac arrest.
The doctor acknowledged that had her irregular heartbeat been detected earlier, he would have ordered a different course of treatment and would have placed her on a heart monitor which was available in her room. He further testified that he would have consulted with a specialist and probably moved her to the Intensive Care Unit.
The causation question is not whether the delay in obtaining the EKG caused Mrs. Smith's demise. Nor is it whether she would have survived if an EKG had discovered the irregular heartbeat sooner. The question is whether providing the deceased with the applicable standard of care would have given her a chance of survival. It stands to reason that placing a patient with an irregular heartbeat in ICU and attaching a heart monitor would have increased the patient's chances of survival. That is the necessary import of Dr. Staudinger's opinion that had he known of the irregular heartbeat sooner, he would have done these things.
It is highly probable that Mrs. Smith's chances of survival would have been increased had the hospital done what it was supposed to have done. This is the test for causation as laid down in Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713 (La. 1986) and Fairchild v. Brian, 354 So.2d 675 (La.App. 1st Cir.1977). I respectfully dissent from the failure to find causation.
NOTES
[*] Judge William A. Culpepper, Retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.