hMARVIN, Justice Ad Hoe.[1]
In this medical malpractice action this court granted a writ to review whether the court of appeal’s reversal, on factual grounds, of the trial court judgment in plaintiffs favor was based on a misapplication of the clearly wrong standard of appellate review this court has mandated. Rosell v. ESCO, 549 So.2d 840 (La.1989); Stobart v. State Through DOTD, 617 So.2d 880 (La.1993).
Our review of the record leads us to conclude that the appellate court’s reversal of the trial court judgment on the basis of clear factual error was correct for reasons which we hereafter assign.
POSTURE
Plaintiff Eugene Byrd suffered from chronic intermittent diarrhea, rectal bleeding and abdominal cramps from December 1985 until February 1987, when his inflamed and severely ulcerated colon was surgically removed. For most of this time, Byrd was in the ^custody of the State Department of Corrections, first in the parish jail in Alexandria and then at Hunt Correctional Center in St. Gabriel.
While incarcerated, Byrd received medical treatment for his condition at Hunt and at state hospitals in Pineville, Baton Rouge and New Orleans. Byrd’s symptoms had subsided when he was released from custody on January 6, 1987, but recurred shortly thereafter, causing him to return to the state hospital in Pineville on January 13, 1987, where his colon was removed on February 19, 1987, after steroids failed to reduce the inflammation of his colon.
Byrd sued the State of Louisiana, through the Department of Public Safety and Corrections and through the Department of Health and Human Resources, alleging generally that the state’s doctors misdiagnosed and improperly treated his condition and specifically that malpractice was committed in these respects in his medical treatment before January 1987. Byrd later claimed that malpractice occurred during his January 1987 diagnosis and treatment, although he did not formally amend his pleadings to specifically include such allegations. At trial, the State objected to evidence of malpractice involving Byrd’s medical care in January 1987, arguing that it was beyond the scope of Byrd’s pleadings. The trial court overruled the objection. The court found that Byrd’s medical treatment before January 1987 comported with the applicable standard of care, but found malpractice occurred in the January 1987 diagnosis and treatment and awarded Byrd $350,000 in damages.
Byrd did not seek appellate review of the trial court’s ruling that no malpractice occurred before January 1987. The State appealed the judgment on both procedural and substantive grounds, arguing that the trial court should not have admitted evidence on Byrd’s claim of malpractice in January 1987 because he did not formally plead that claim, and that the court was clearly wrong in finding the State negligent on the basis of that evidence, even if it was admissible.
laReversing on the substantive issue, the appellate court concluded the trial court was clearly wrong in finding that the evidence preponderately proved each of the three factual elements of a malpractice cause of action under LSA-R.S. 9:2794: the applicable standard of care, breach of that standard, and injury caused by the substandard conduct. The appellate court did not squarely rule on the procedural issue raised by the State. Byrd v. State, Through DPS, 625 So.2d 315 (La.App. 3d Cir.1993).
Pretermitting discussion of the procedural issue, we shall assume, for discussion purposes, that the evidence about Byrd’s medical treatment in January 1987 was admissible. That evidence, which we shall discuss in detail below, however, and even when viewed most favorably toward upholding the trial court judgment, simply does not reasonably support the trial court’s factual findings. The trial court’s view of the evidence, on this record, is not a “permissible” view under Rosell and Stobart, cited supra.
*116 FACTS
The medical evidence explains that Byrd had one or more types of colitis, or inflammation of the colon, during the period 1985-1987. Colitis may be caused by bacterial or viral agents or may also occur without an identifiable cause. The inflammation may be limited to the lowest part of the colon, the rectum, in which case it is called proctitis, or it may extend to other parts of the colon, which form a rather lengthy inverted U-shape in the abdomen and include the sigmoid colon, the ascending colon, the transverse colon and the descending colon.
Symptoms such as Byrd experienced (diarrhea, cramps and .rectal bleeding) are commonly associated with every type of colitis of whatever etiology. Diagnostic tests are performed to identify the cause of these symptoms. If the tests reveal the presence of a bacterial or viral agent in the colon or rectum, the colitis is named according to the cause of the inflammation (i.e., viral colitis, or, more specifically, herpetic colitis if the virus can be identified as the herpes simplex virus). If the cause of the colitis cannot |4be discovered by the diagnostic tests, the condition is simply called ulcerative colitis. Byrd’s condition was diagnosed as herpetic proctitis in September 1986, as herpetic colitis in December 1986, and as ulcerative colitis in January 1987.
Ulcerative colitis may affect all or only part of the colon, while herpetic colitis generally does not affect the entire colon unless the patient’s immune system is compromised, as, for instance, by a condition such as AIDS. Byrd was not an immunocompromised patient. Areas of internal inflammation of the colon may be seen by the use of lighted tubes or “scopes” which are inserted through the anus and into the colon to allow the doctor to view all or part of the colon. When the inflammation is mild or moderate, the appearance of the colon is much different in a case of herpetic colitis than in ulcerative colitis. If the inflammation is severe, however, the appearance of the colon is similar for both herpetic and ulcerative colitis. The appropriate medical treatment of these two conditions differs in the respects discussed below.
The inflammation Byrd experienced was initially limited to his rectum, being revealed by a visual examination of his lower colon (rectum and sigmoid colon) with a sigmoido-scope. The sigmoidoscopy was performed at Charity Hospital in New Orleans in August 1986. Doctors there diagnosed his condition as herpetic proctitis in September 1986 after learning that a tissue sample taken from his rectum tested positive for the presence of the herpes simplex virus.
Herpetic colitis is not curable medically but goes through periods of spontaneous exacerbation and remission, or waxing and waning. The antiviral medication Acyclovir, also marketed as Zovirax, may reduce the duration and severity of the herpetic episode during periods of exacerbation, but is not always prescribed, even when the herpes virus is known to be the cause of the patient’s inflammation, because the symptoms generally resolve on their own, without medical intervention. By the time Byrd’s condition was definitively diagnosed in September 1986, his symptoms had subsided and he was not given or prescribed Zovirax at that time.
I sin December 1986, Byrd had a recurrence of his former symptoms, with a more significant amount of blood loss through the rectum, which caused him to become anemic. He also had a skin abscess near his rectum. He was sent to Earl K. Long Memorial Hospital in Baton Rouge for treatment. Although his colon was not visually examined to determine the precise extent of the inflammation, the degree of blood loss indicated to doctors that his inflammation extended beyond the rectum into other parts of the colon. Based on the presence of the perirectal abscess, which is fairly common in patients with herpetic colitis but rare in patients with ul-cerative colitis, and on Byrd’s prior positive test for the herpes virus in his rectal tissue, his condition in December 1986 was diagnosed as herpetic colitis.
Byrd received blood transfusions for his anemia and had the rectal abscess surgically drained. During this December 1986 hospitalization, Byrd’s doctors discussed the possibility of removing his colon, but concluded that surgery was not necessary when his bloody diarrhea and cramps spontaneously *117 subsided. The doctors did not administer Zovirax while Byrd was in the Baton Rouge hospital.
Byrd was discharged to return to Hunt Correctional Center on December 27, 1986, with instructions to the staff doctors at Hunt to monitor his condition. Notwithstanding that Byrd was then asymptomatic, a staff doctor at Hunt prescribed a six-month regimen of Zovirax to be taken orally, as suppressive or preventive treatment, although the efficacy of Zovirax in preventing recurrences of herpetic colitis had not yet been clearly established in the medical literature. The staff doctor explained that he elected to try this course of treatment because of the severity of the inflammation and associated blood loss during Byrd’s most recent episode, which presented to this doctor a “significant danger” that Byrd’s colon would have to be removed.
The staff doctor gave Byrd a five-day supply of Zovirax on December 30, 1986. Byrd testified that he “took the medicine” prescribed by that doctor, but was not asked whether he took only the five-day supply or obtained additional Zovirax pills thereafter.
I (¡Byrd was released from the state’s custody on January 6, 1987. Again experiencing symptoms, he went to the emergency room of Huey P. Long Memorial Hospital, the state hospital in Pineville, on January 13, 1987, complaining of bloody diarrhea and abdominal cramps. Byrd had been examined at the Pineville hospital in December 1985, when he first began having gastrointestinal problems while incarcerated in the Alexandria jail, but his evaluation at Pineville was interrupted by his transfer to the state facility, Hunt Correctional Center, in St. Gabriel in January 1986. The Pineville hospital was not involved in Byrd’s medical care during 1986. Upon his return to the Pineville hospital in January 1987, Byrd reported that he had had similar symptoms off and on for the past 1½ years and that doctors at other state hospitals had diagnosed his condition as her-petic colitis.
Dr. Tod Engelhardt, a third-year surgery resident at the Pineville hospital, examined Byrd’s colon with a colonoscope on January 19, 1987, finding severe inflammation covering the entire length of Byrd’s colon, with no areas of normal tissue at any point. After performing tests in Pineville to rule out bacterial causes of the inflammation, Dr. Engel-hardt diagnosed Byrd’s condition as ulcera-tive colitis. Viral tests could not be done in the Pineville hospital. A viral test could have been performed in the New. Orleans hospital but the results would not have been pronounced for a week or more, according to all experts.
Dr. Engelhardt did not deem it necessary to test for viral causes, such as herpes, notwithstanding that he knew that Byrd had been diagnosed with herpetic colitis during prior bouts with bloody diarrhea and abdominal cramps, because the inflammation that Dr. Engelhardt saw affected Byrd’s entire colon and the likelihood of such extensive inflammation being caused by a virus in a patient such as Byrd, whose immune system was not compromised, was thought to be extremely remote. According to Dr. Engel-hardt, the relative probabilities that Byrd had ulcerative as opposed to herpetic ^colitis in January 1987, based on the appearance of his colon and other diagnostic information, were “999,000 to one.”
Ulcerative colitis, like herpetic colitis, is not curable medically and may appear and subside on its own, with or without medical treatment. It does not always affect the entire colon, but when it does, it poses significant and sometimes life-threatening risks to the patient unless it is treated medically, with steroids to reduce the inflammation, or surgically, by removal of the colon, according to all experts.
Dr. Engelhardt discussed these risks and the medical and surgical options with Byrd after the January 19, 1987, colonoscopy. Byrd declined surgery and elected to undergo intensive steroid treatment for ten days rather than having surgery.
Byrd’s overall condition improved during the course of the steroid treatment. His temperature of 101.5° returned to normal, his bloody diarrhea and cramps went away, and he reported that he felt much better. After the steroid treatment was concluded, Dr. En-gelhardt performed another colonoscopy on *118 January 29, 1987 to assess the condition of Byrd’s colon. The extent of inflammation was no different, neither better nor worse, than it was ten days earlier, before the steroid treatment began. Byrd thereafter consented to surgery to remove his colon, which was performed by Dr. Engelhardt at the Pmeville hospital on February 19, 1987.
Byrd initially alleged that Dr. Engelhardt’s diagnosis of ulcerative colitis was correct; that the doctors who had earlier seen and treated him had misdiagnosed his condition as herpetic proctitis or colitis; and that their misdiagnosis and failure to institute steroid treatment, the appropriate medical treatment for ulcerative colitis, caused his condition to worsen and led to the eventual removal of his colon.
Byrd later asserted, albeit only informally, that he was suffering from herpetic colitis all along; that Dr. Engelhardt misdiagnosed his condition as ulcerative colitis; and that Dr. Engelhardt’s administration of steroids, which are known to suppress the immune system and reduce its ability to combat any virus that may be causing the inflammation, I sallowed the herpetic condition to worsen to the point where removal of his colon was required.
Byrd did not allege any negligence in the manner in which the surgery was performed.
OPINION TESTIMONY
Byrd presented testimony from each of his treating physicians at Hunt and at the various state hospitals, and from Dr. Naurang Agrawal, an expert in gastroenterology, who assessed the conduct of each of the treating physicians. Dr. Agrawal was initially the State’s expert who later became Byrd’s expert. We limit our discussion of the expert testimony to Byrd’s treatment by Dr. Engel-hardt in January 1987, that being the basis for the trial court’s finding of malpractice.
The experts agreed that a diagnosis of ulcerative colitis, the cause of which is not known medically, is reached by exclusion and can only be made after diagnostic tests rule out each of the known causes of colitis (such as specific bacterial or viral agents). They also agreed that steroids are the appropriate medical treatment for ulcerative colitis but are generally contraindicated in patients with herpetic colitis because steroids suppress the body’s immune system, reducing its ability to fight viruses such as herpes.
Dr. Agrawal opined that the contraindication of steroids in these circumstances is relative rather than absolute, explaining that the doctor may choose to give steroids to a patient with herpetic colitis, notwithstanding the known risk that that condition may worsen, if the administration of steroids is necessary to protect the patient from other significant health risks.
Dr. John Harrington, a gastroenterologist who treated Byrd at the New Orleans hospital in mid-1986, agreed with Dr. Agrawal that Byrd may have had both ulcerative colitis and herpetic colitis in January 1987 and that Dr. Engelhardt’s diagnosis of ulcerative colitis appeared to be correct based on the description of Byrd’s condition contained in the medical records.
19Pr. Ellis DeVille, an internist who treated Byrd at the Baton Rouge hospital in December 1986, testified that he and a staff surgeon discussed the possibility of removing Byrd’s colon at that time, due to the severity of his recent inflammation and associated blood loss, but deemed surgery unnecessary when Byrd’s low blood count improved after he received blood transfusions and his other symptoms resolved spontaneously.
Dr. Michael Hegmann, the Hunt staff doctor, explained that he prescribed Zovirax for Byrd as suppressive or preventive treatment for his herpetic colitis when Byrd returned to Hunt from the Baton Rouge hospital because there was a “significant danger” that his colon would have to be removed if he had a recurrence of severe inflammation and blood loss.
Dr. Engelhardt testified that he was not alarmed initially about Byrd’s external symptoms and complaints. He said he became alarmed and considered Byrd’s condition to be life-threatening when he saw, during the first colonoscopy, that Byrd’s entire colon was inflamed. This occurred before Byrd *119 had any steroid treatment. Dr. Engelhardt said he knew on January 19, 1987, that Byrd would need to have his colon removed eventually. Dr. Engelhardt instituted the steroid treatment only after Byrd declined surgery and elected medical treatment as an alternative.
When Dr. Engelhardt repeated the colono-scopic examination on January 29,1987, after Byrd’s course of steroid treatment, he found “the same amount of disease that was noted during the last colonoscopy,” according to the report written by him of the second examination. Dr. Engelhardt testified in accord with his written report that Byrd’s colon appeared no different, neither better nor worse, on the second examination than it appeared on the first. He found no evidence from those examinations that the steroid therapy had suppressed Byrd’s immune system to any extent, so as to permit any viral condition that may have been present to worsen.
ImDr. Engelhardt was questioned about a letter he wrote for Byrd on February 10, 1987, explaining Byrd’s condition in the event Byrd elected to seek treatment from a private physician. In the letter, Dr. Engelhardt stated that Byrd’s condition after the first colonoscopy on January 19, 1987, was “without a doubt, ulcerative colitis,” and that the repeat colonoscopy ten days later “showed no resolution of his symptoms and the colon, in fact, appeared to be progressing with the disease.” At trial, Dr. Engelhardt testified that the last-quoted statement in that letter was erroneous in two respects:
When you colonoscope you’re not showing a resolution of symptoms. Symptoms are ... the problems that the patient is having. I couldn’t see symptoms with a colo-noscope .... And ... the colon looked exactly the same [on the second colono-scopic examination as it did on the first], as I stated in my operative report [of January 29,1987].... [The statement in the letter that] the colon in fact appeared to be progressing with the disease ... [is] incorrect. (Our brackets.)
Dr. Engelhardt explained that he did not perform diagnostic tests to definitively confirm or rule out a viral cause of Byrd’s colitis before he began the steroid treatment, even though he knew of Byrd’s prior diagnosis of herpetic colitis at another hospital, because the configuration and appearance of Byrd’s colon, as revealed respectively by a barium enema and the first colonoscopy, presented a “textbook picture of ulcerative colitis.” Dr. Engelhardt further testified that he could not have obtained an adequate tissue sample from Byrd’s colon to be used to test for viruses because such samples, to be effectively tested, must be taken from the base of an isolated or discrete ulcer, and no such areas were available in Byrd’s colon, the entire surface of which was ulcerated.
DR. AGRAWAL’S TESTIMONY
On direct examination by Byrd’s counsel, Dr. Agrawal testified on the one hand that Dr. Engelhardt violated the applicable standard of care by giving Byrd steroids without first ruling out a viral cause of his inflammation, such as herpes, by taking tissue samples from Byrd’s colon and performing specific diagnostic tests on the biopsy tissue, including either or both viral cultures and a fluorescent antibody screen. Dr. Agrawal was not asked on direct examination whether such substandard conduct reduced Byrd’s hi chances of having his condition treated successfully with appropriate medication, thus obviating the need for surgical removal of his colon.
On the other hand on cross-examination, Dr. Agrawal explained that it would have taken one or two weeks to obtain the results of such diagnostic tests and said that if he were treating Byrd, he would have given him steroids immediately, just as Dr. Engelhardt did, even if the viral tests had been performed, “irrespective of the risk ... [o]f possibly making a viral colitis worse.” Dr. Agrawal said that even if Dr. Engelhardt had performed the diagnostic tests, it would have been reasonable for him to have commenced steroid treatment immediately, before he received the test results, because Byrd was gravely ill when Dr. Engelhardt first saw him and required immediate treatment at that time. According to Dr. Agrawal, ulcera-tive colitis is far more common than herpetic colitis and “the risk benefit ratio was much more in favor of the patient getting better *120 with steroids than waiting for the tests or making his condition worse [by not giving him steroids while awaiting the test results].” Our brackets. Dr. Agrawal said that if the tests had come back positive for herpes, he would have stopped the steroid treatment at that point and started treating Byrd with Zovirax.
Because the viral studies were not performed on Byrd in January 1987, Dr. Agra-wal obviously did not and could not say definitively whether Byrd had herpetic colitis at that time. He initially said it was “possible” that Byrd had herpetic colitis, but later testified that he had “no reason to dispute Dr. Engelhardt’s diagnosis” of ulcerative colitis based on the description of Byrd’s condition in the January 1987 medical records.
Dr. Agrawal testified that ulcerative colitis may develop “overnight,” and may affect the entire colon “within a week.” He said Byrd’s entire colon could have become inflamed due to ulcerative colitis between his discharge from the Baton Rouge hospital on December 28,1986, and his visit to the Pineville hospital on January 13, 1987. In contrast, according to Dr. Agrawal, it would be “very unlikely” that a patient such Byrd, hawhose immune system was not compromised, would suddenly develop inflammation of his entire colon due to herpetic colitis.
Dr. Agrawal opined that if Byrd had her-petic rather than ulcerative colitis when the steroid treatment began on January 19,1987, steroids would likely have caused Byrd’s condition to worsen within 24^48 hours. Dr. Agrawal agreed that Byrd’s medical records showed no deterioration, but rather some slight improvement, in Byrd’s overall condition during his ten-day course of steroid treatment (less blood loss, fever subsided, patient reported he was feeling better, etc.), and no change, for better or worse, in the appearance of his colon before and after he received steroids.
Dr. Agrawal opined that it was possible, though unlikely, that Byrd had both ulcera-tive colitis and herpetic colitis in January 1987. He said that had viral studies been performed, they would have helped to diagnose the presence of both conditions. When asked whether Zovirax would have battled Byrd’s condition into remission if he had herpetic colitis in January 1987, Dr. Agrawal said simply, “we don’t know.” From his examination of Byrd’s medical records, Dr. Agrawal squarely opined that Dr. Engel-hardt’s administration of steroids for ten days without performing diagnostic studies to rule out a viral cause of Byrd’s inflammation “did not make his condition worse.” Our emphasis.
Dr. Agrawal testified generally that there was “no reason” why Dr. Engelhardt could not have performed viral studies on Byrd. Neither Dr. Agrawal nor any other expert witness was specifically asked about or contradicted Dr. Engelhardt’s statement that the condition of Byrd’s colon prevented the obtaining of an adequate tissue sample to be tested.
The testimony of Drs. Agrawal, Harrington, DeVille and Hegmann was the only expert evidence Byrd relied on to show Dr. Engelhardt’s alleged malpractice.
JijFINDINGS BELOW
The trial court found that Byrd “actually had herpetic colitis” rather than ulcerative colitis when Dr. Engelhardt treated him in January 1987, and that Dr. Engelhardt’s “failure to determine whether [Byrd] had a viral infection before the administration of the steroids was a deviation from the standard of care ... [which] led to an increase in [the severity of] the herpetic condition and ultimately to the necessity of the removal of the colon.” Emphasis in original; our brackets.
The trial court said, “There is every indication that had a correct diagnosis been made [Byrd’s] condition could have been brought under control and the removal of the colon would not have been necessary.”
The court of appeal, reversing the trial court judgment on factual grounds, stated:
The basis of the trial court’s ruling is simply that but for the improper use of steroids by Dr. Engelhardt, Byrd’s colon would not have been removed. This finding is clearly wrong. First, Byrd’s poor condition raised the possibility of a colecto-my as early as December 1986, although it *121 was ruled out as Byrd improved. Second, in January, before steroid therapy was initiated, Dr. Engelhardt offered surgery, i.e., a colectomy, as one of Byrd’s options. Third, the condition of Byrd’s colon was no worse after steroid therapy than before. Fourth, Byrd actually improved symptomatically after steroid therapy, even though his colon had not been able to heal. Finally, the opinion of Dr. ... Agrawal, Byrd’s expert gastroenterologist, was that Byrd did indeed have ulcerative colitis in January 1987. In other words, the plaintiffs own expert agreed with the diagnosis made by Dr. Engelhardt. Dr. Agrawal stated that had he been the treating physician, he may well have initiated steroid therapy, just as did Dr. Engelhardt. Further, Dr. Agrawal testified that if Byrd was experiencing a recurrence of herpetic colitis or proctitis in January 1987, his condition should have deteriorated within 24 to 48 hours of the initiation of steroid therapy, which did not happen in this case....
... Byrd attempted to prove that Dr. En-gelhardt should have tested him for her-petic proctitis or colitis prior to instituting steroid therapy. No witness agreed with this proposition. In fact, the evidence proved the opposite: Byrd’s condition required immediate steroid therapy or surgery, and the only adequate test for her-petic proctitis could not be performed because of the condition of Byrd’s colon. The record does not support the argument that the standard of care applicable to Dr. Engelhardt required testing for herpetic proctitis.
... Dr. Agrawal’s agreement with Dr. En-gelhardt’s diagnosis and treatment shows that the standard of care, whatever it may have been, was not violated.
| Additionally, on the causation question, there was no evidence even suggesting that steroid therapy led to the need for a colectomy, as the trial judge stated ...
625 So.2d at 317-318; footnotes omitted. The appellate court found the evidence in the record insufficient to prove each of the three elements of a medical malpractice cause of action: the applicable standard of care, breach of that standard, and that that breach caused injury to the plaintiff.
DISCUSSION
To support his argument that the trial court’s view of the evidence was a “permissible” view, shielding that court’s judgment from reversal by the appellate court on factual grounds, under the standards of Rosell and Stobart, both cited supra, Byrd relies on these statements extracted from Dr. Agra-wal’s testimony:
—“It is possible” that Byrd had herpetic colitis in January 1987.
—Notwithstanding that Dr. Engelhardt may be said to have acted reasonably in beginning steroid treatment immediately, he should have tested Byrd for herpetic colitis and, if the tests came back positive, he should have discontinued the steroid treatment and instituted treatment with Zovirax.
—“There is no reason” why the testing for herpetic colitis could not have been done in this case.
—“We don’t know” whether the administration of Zovirax in January 1987 would have battled Byrd’s condition into remission.
Even when these statements are isolated from the other statements of Dr. Agrawal, the isolated statements do not establish, more probably than not, that Byrd had her-petic rather than ulcerative colitis in January 1987, and that the removal of his colon would not have been necessary if Dr. Engelhardt had tested him for herpetic colitis and begun treatment with Zovirax only after the test results were obtained.
Dr. Agrawal’s testimony, taken in its entirety, squarely demonstrates Dr. Agrawal’s agreement with Dr. Engelhardt’s diagnosis of ulcerative colitis. Dr. Agrawal opined that it was possible, but unlikely, that Byrd had both herpetic and ulcerative colitis in January 1987. However, neither Dr. Agrawal nor any other expert witness said or inferred that hsByrd actually had herpetic colitis in January 1987 rather than ulcerative colitis, as the trial court found. *122 Dr. Agrawal squarely agreed that it was reasonable for Dr. Engelhardt to have commenced steroid treatment immediately, even if he had performed diagnostic tests for her-petic colitis, considering the severity of Byrd’s illness and the fact that it takes a week or two to obtain the results of viral tests. The sole area in which Dr. Agrawal disagreed with Dr. Engelhardt’s course of action was in his failure to test Byrd for herpetic colitis so that his medical treatment could be altered from steroids to Zovirax if the test results warranted such a change. Dr. Agrawal testified that he would have performed such tests had he been treating Byrd, but did not squarely say that Dr. Engelhardt’s failure to do so amounted to substandard medical conduct.
This testimony by Dr. Agrawal may arguably be construed to show that Dr. En-gelhardt owed and breached some duty of care toward Byrd, while not precisely the duty found to have been breached by the trial court. In the light of the totality of the evidence, and particularly of Dr. Agrawal’s opinion evidence, we can agree with Byrd’s argument that the court of appeal misapplied our appellate review standard in concluding that “[t]he record does not support the argument that the standard of care applicable to Dr. Engelhardt required testing for herpetic [colitis].” 625 So.2d at 318.
Notwithstanding our agreement on this point, however, Byrd’s argument fails for these reasons: To recover for medical malpractice, a plaintiff must prove not only that the applicable standard of care was breached, but also that the doctor’s substandard conduct caused an injury (here, removal of colon) that the plaintiff would not otherwise have suffered. LSA-R.S. 9:2794. Our emphasis. See also Smith v. State Through Dept. of HHR, 517 So.2d 1072 (La.App. 3d Cir.1987), affirmed, 523 So.2d 815 (La.1988).
The finding that Dr. Engelhardt breached the applicable standard of care by failing to test Byrd for herpetic colitis so that his medical treatment could be altered if warranted by the test results, does not relieve Byrd of the additional burden of showing, by a hfipreponderance of the evidence, that this breach caused him an injury that would not otherwise have occurred. Byrd has failed to meet that burden on this record, as we shall demonstrate:
The only evidence Byrd offered to show that the condition of his colon worsened because of his treatment with steroids was Dr. Engelhardt’s letter of February 10, 1987, stating that Byrd’s colon “appeared to be progressing with the disease” on the second colonoscopic examination, which was performed after his steroid treatment ended, compared with its appearance on the first colonoscopy, before he received steroids. Dr. Engelhardt’s operative report of the second procedure on January 29 states, however, that he found “the same amount of disease that was noted during the last colonos-copy.” Dr. Engelhardt testified that his description of Byrd’s colon in the operative report was accurate, while his description in the later February 10 letter was inaccurate. No one contradicted this. All experts agreed with the medical records that stated Byrd’s condition from time to time.
The medical records show, as Dr. Agrawal emphasized, that Byrd’s general physical condition did not worsen during the course of the steroid treatment, as would have been expected had Byrd had herpetic colitis, but actually improved slightly. Neither Byrd’s testimony, nor any other evidence in the record, gives a contrary view of his condition during that time.
As the court of appeal noted, Byrd’s colitis, irrespective of its cause, was severe enough to cause Dr. Engelhardt to seriously discuss surgical removal of the colon with Byrd before the steroid treatment began. Byrd elected medical treatment first, consenting to surgery only after the medical treatment failed to reduce the pervasive inflammation of his colon. There is simply no evidence that the surgery was performed because Byrd’s condition worsened during the course of the steroid treatment, as the trial court found.
The record is also devoid of evidence to show, as the trial court found, that Byrd’s condition “could have been brought under control” medically, with Zovirax, if the | ^condition had been diagnosed as herpetic *123 colitis. The only expert witness to testify on this subject was Dr. Agrawal. As discussed above, he opined that Byrd either had ulcera-tive colitis, or perhaps both ulcerative and herpetic colitis, and said only, “we don’t know” whether Zovirax would have successfully treated his condition.
The record fully supports the appellate court’s conclusion that the trial court was clearly wrong in finding that the removal of Byrd’s colon would not have been necessary had Dr. Engelhardt not administered steroids when he initially treated Byrd’s colitis. Byrd’s evidence, even if accepted in its entirety, and in the light that most favorably supports the trial court’s judgment, simply did not prove, more probably than not, that Dr. Engelhardt’s conduct, even if substandard in the limited respects testified to by Dr. Agrawal, caused Byrd to suffer any injury that he would not otherwise have suffered.
DECREE
The judgment of the court of appeal is AFFIRMED.
WATSON, J., dissents, believing the trial court was not clearly wrong.
ORTIQUE, J., dissents and assigns reasons.

. Hall, J., not on panel. Rule IV, Part 2, § 3. Chief Judge Charles A. Marvin of the Court of Appeal, Second Circuit, sitting for Dennis, J.